# LAMBERT/COFFIN

ATTORNEYS

May 21, 2019

John F. Lambert, Jr., Esq.
jlambert@lambertcoffin.com

Hon. Rya W. Zobol
Senior District Court Judge, MA
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 02210

    Re: *USA v. John Vandemoer*
    Docket No: 1:19-cr-10079
    Disposition: June 12, 2019

Dear Judge Zobol:

    I write on behalf of my wife, Kim Caldwell, and our daughters, Emily (29), Deirdre (26), and Julia (23), to provide you with our family's thoughts on John Vandemoer that we hope will provide you with additional information to inform your disposition of John's plea on June 12, 2019.

    We first met John in 2003 when he was assigned to Emily (age 13 at the time) as a coach for an Optimist dinghy event sponsored by the Optimist sailing class that she had earned through her results. Emily was young and new to this much higher level of competition. John was very kind and welcoming to a very shy, nervous middle schooler. John subsequently coached Emily at quite a few events and was consistently affirming and very helpful, teaching Emily how to turn a disappointing result into something of value. I will never forget the afternoon when Emily finished second to last in one high stakes event while two of her teammates who were doing just as poorly, quit. John greeted her on shore with genuine pride in her having sailed the painful last leg rather than quit like her peers and told her so. The moment was representative of a perspective of John's that was unique in youth sports; it is not about the results. With John's help, it became one of those important moments for a kid: understand that failure is ok; it is not the end of the world.

    Over the following years, my interactions with John increased. He coached Deirdre and Julia on many, many occasions. All of the sailing events in which the kids sailed were run by volunteers and I ended up organizing a great many of them. During this time, I routinely turned to John to serve as a race officer or a judge (sailing's referee) for the event on an unpaid basis and John almost always said yes. John gave countless free hours to the kids and the sport with no benefit for him – other than the time with the kids. He loved the kids.

    As you know, no good deed goes unpunished, and one of the consequences of volunteering my time was that I was asked to run the Club 420 Sailing Class when new leadership took over the Class. During this time, my exploitation of John's generosity kicked into high gear and his

Hon. Rya W. Zobol
May 21, 2019
Page 2

contributions to the sport were immense. John was running races, coaching, serving as judge, running clinics, almost always unpaid.

After several years, the Class was in a position to pay a small amount for a part-time Executive Director and while we had many applicants, I purposefully sought out John for the job. At that time, US Sailing was pushing its Olympic Development youth program seeking to direct young kids (and their parents) into an absurdly expensive class of boats and training programs with the expectation that years later they would be Olympic competitors. I knew that John would be willing to push back forcefully and advocate for the perspective that youth sailing was about fun, making friends, development of lifelong skills on the water, following the racing rules in a largely self-policed environment, and responsibility for equipment that was all going to be resold to the next household coming into the Class. John accepted the ED job and held it until this spring. During that time, John was the embodiment of what is valuable in youth sports; have fun, make friends, play by the rules, learn to lose gracefully, and respect your equipment.

Mercifully (but sadly), my kids aged out of youth sailing and I had an excuse to stop volunteering. My most recent chapter with John has been with John as Julia's coach at Stanford until she graduated last June. Despite the sadness, there are some ironies in this situation, one being the news focus on sailing as a chit for college admission. My three daughters sailed in different colleges and with each college, the athletic departments used the GPAs and SATs of the sailing (and crew) team to raise the average scores of all athletes. It is to the advantage of any coach to have as many potential recruits as possible in case admissions says no to one or the kid chooses to go elsewhere. Many coaches mislead kids into their chances for admission, hoping to retain for themselves as many options as possible. Not John. John was incredibly honest about where Julia stood; the academics were no problem but she was not first on his list of recruits, thus allowing her to make the decision whether to look elsewhere. John's recruitment process was transparent and scrupulous. I was thrilled Julia said no to other schools to see what happened with John and Stanford. I wanted her to sail for John because I trusted him with my last kid.

We are all bewildered by what has happened and heartbroken for John, Molly, and their children. Nothing in our many interactions with John over the last sixteen years is even remotely similar or suggestive of the conduct to which John promptly confessed; actually, just the opposite. Contrary to some of the public perceptions of sailing as only for the very privileged, there are is a actually a very healthy amount of sailing occurring throughout the country in community centers and elsewhere (MIT runs an incredible number of kids through its summer sailing program – the Charles River Sailing Academy ) providing kids the chance to be on the water and learning some boat skills. It would be a shame if John's considerable talents were not committed to such an effort.

I thank you for your time.

Very truly yours,

John F. Lambert, Jr.

JFL