UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                        ) | Criminal No. 19-10079-RWZ |
| ) | |
| JOHN VANDEMOER,            ) | |
| ) | |
| Defendant               ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this sentencing memorandum in advance of the June 12, 2019 sentencing of the defendant, John Vandemoer.

Over the course of approximately two years, the defendant—the former head sailing coach at Stanford University—participated in a sweeping bribery, fraud and money laundering scheme that helped secure the admission of students to elite universities over other, more qualified applicants. His actions not only deceived and defrauded the university that employed him, but also validated a national cynicism over college admissions by helping wealthy and unscrupulous applicants enjoy an unjust advantage over those who either lack deep pockets or are simply unwilling to cheat to get ahead. For those who participated in this conspiracy—the parents who paid the bribes, the students who benefited from them, and the coaches and administrators, like Vandemoer, who accepted them—the system was, in fact, rigged in their favor. Likewise, for the very real victims of these crimes—including those who were denied admission to college based on their own merits—the system was, in fact, stacked against them.

For all these reasons, the government respectfully submits that the defendant should be sentenced to a term of imprisonment of 13 months, followed by one year of supervised release.

By the government's calculation, the advisory Sentencing Guidelines range is between 37 and 46 months, although the range stipulated in the plea agreement between the parties is between 33 and 41 months.  On the facts related to this particular defendant, however, the government does not assert that proportional and just punishment requires a sentence within the Guidelines range, insofar as the defendant has otherwise led a law-abiding life, did not directly profit financially from his crimes, promptly accepted responsibility for them, appears genuinely remorseful, and is unlikely to reoffend.

At the same time, a meaningful term of incarceration is nonetheless needed in this case. Beyond providing just punishment, it is also the only way to deter similarly situated individuals, that is, those entrusted with the power to shape futures, from secretly abusing that trust for personal benefit.  It is also the only way to begin restoring confidence in a college admissions system that most people agree is needlessly unfair.

A.  Overview of the Offense Conduct

The defendant pled guilty to participating in a racketeering conspiracy that involved accepting bribes in exchange for agreeing to recruit applicants to Stanford's sailing team, thereby facilitating their admission to the university without regard for their actual athletic ability.[1]  In short, it was a bribery scheme.  The defendant did not take the money for his own personal use, but benefited from the money indirectly: he funneled the criminal proceeds to accounts he controlled for the university sailing program.  This was an illicit *quid pro quo*, in violation of his fiduciary duty to Stanford:  he secretly sold recruitment slots in exchange for payments that were used to benefit the sailing program he ran, and so enhanced his own career prospects.

---

[1] *See* Doc. 1, ¶ 8a (alleging that the conspirators carried out the scheme by "designating applicants as purported recruits for competitive college athletic teams, including the Stanford sailing team, without regard for the applicants' athletic abilities, in exchange for bribes").

The defendant's misconduct occurred over the course of about two years.  He was first introduced to the conspiracy's architect, William "Rick" Singer, in or about the fall of 2016, when Singer asked the defendant to designate a student from China ("Student A") as a sailing recruit. Although Singer and the defendant did not immediately settle on a specific payment for the recruitment slot, Singer made clear that in exchange for the recruitment, Student A's family would "endow" sailing coach salaries, and that Singer would be the "guarantor" to ensure that the payments from Student A's family were made.  The purpose of this proposition was to ensure Student A's admission to Stanford as a recruited athlete.  Singer created a falsified sailing profile for Student A, and Student A's Stanford application included falsified sailing credentials. Ultimately, despite the defendant's efforts, it proved too late in the recruiting season to secure a slot for Student A as an athletic recruit, although the student was later admitted to Stanford through the regular application process.  In exchange for the defendant's efforts, however, and in anticipation of his help in illicitly "recruiting" future Singer clients, Singer paid $500,000 to the defendant's sailing program, as a purported contribution from the Key Worldwide Foundation ("KWF"), a largely sham charity Singer controlled.[2]

With the defendant now complicit and engaged in the scheme, Singer brought him additional recruits, beginning with Student B in the fall of 2017.  Referencing his prior $500,000 payment, Singer advised the defendant in an e-mail that there would be the "same outcome for both sides" if Vandemoer designated Student B as a sailing recruit.  Toward that end, Singer paid $110,000 to the defendant's sailing program in the spring of 2018, and, in exchange, the defendant

---

[2] As part of the scheme, Singer and his co-conspirators laundered bribe payments through KWF to conceal their nature and source.  After Student A's admission to Stanford, the parents of Student A made a $6.5 million payment to KWF.

designated Student B as a sailing recruit.  Ultimately, however, Student B chose to attend Brown University instead.

In a telephone call intercepted pursuant to a court-authorized wiretap on July 28, 2018, Singer told the defendant that he had "three other kids" who could potentially take Student B's "spot."  The defendant agreed.  Thereafter, at Singer's request, the defendant designated a third applicant, Student C—who was not a competitive sailor—as a sailing recruit, falsely advising university officials in an internal "ranking and justification" form that Student C, who lived in Las Vegas, Nevada, "had solid experience at Newport Beach [California] Yacht club and training at the US sailing center in Long Beach [California]."  Vandemoer wrote:  "She is an athlete from other sports who converted late to sailing.  She has the potential to be a really athletic crew for us. She lives in Las Vegas during the year and commutes to Newport Beach to sail."  This was not true.  Ultimately, however, despite being approved for a recruiting slot as a result of the defendant's efforts, Student C chose to attend Vanderbilt University.

The *quid pro quo* nature of the scheme was memorialized in multiple recorded telephone calls between the defendant and Singer.  On October 2, 2018, for example, Singer—who by this point was cooperating with the government's investigation—advised the defendant that, although Student C would not attend Stanford, Singer would nonetheless pay the defendant in order to keep their "relationship alive."  The following is an excerpt from the call:

**SINGER:**   Good, so I got some bad news. The bad news is that [Student C] decided that she doesn't really want to go to Stanford. She really wants to go to Vanderbilt. So they're not going to move forward.

**DEFENDANT:**   [inaudible].

**SINGER:**   And they're not going to make their $500,000 payment to you. But I'm, you know, I'm still going to be supportive to you. So I can -- I will figure out what can make sense so I can pay you, you know, 100, 200,000. Would that be okay [inaudible] pay that to you?

**DEFENDANT:**    Yes, that would be -- that would be fantastic.

**SINGER:**    Okay. And then because, you know, I know we gave 500K for [Student A], but I -- I don't think I can do the 500K paying to you just out of my own pocket, my own foundation. So --

**DEFENDANT:**    Okay.

**SINGER:**    -- if you're okay, I'll -- I'll get back to you, 100 or 200K, I'll pay to you. And then that way, hopefully it, you know, keeps our relationship alive, and I apologize for this whole thing.

**DEFENDANT:**    Yeah, no, not a problem. Okay [inaudible].

**SINGER:**    [inaudible] is that okay with you?

**DEFENDANT:**    Yeah, yeah, absolutely.

Three days later, on October 5, 2018, Singer promised the defendant $160,000 as a deposit for agreeing to recruit a future student.

**SINGER:**    Hey, John, sorry I was swamped. I'm in Boston right now. So I'm actually on my way back to the Bay Area but, but I'm still in Boston. So here -- here's -- here's a question for -- or this is what I'd like to see if we can make happen. I will --

**DEFENDANT:**    Okay.

**SINGER:**    -- send you $160,000 as, to you. And can we make that so that it will count toward the next student that we have? Because w-- what do I normally give you? I give you how much? Normally is the –

**DEFENDANT:**    Uh [inaudible].

**SINGER:**    The last [inaudible] you -- I gave you 500, right?

**DEFENDANT:**    Yeah, yeah.

**SINGER:**    Okay. So could the 160 count towards the 500 for next year or something?

**DEFENDANT:**    Yes. Yeah. Yeah, that could work.

**SINGER:**    [inaudible] So, okay, so -- so essentially what you're saying is -- I-- I just want to make sure because I've done this before. And I just need to make sure --

**DEFENDANT:**     Yeah.

**SINGER:**     So -- so I'll send you 160,000. And then for next year [inaudible] get a kid and normally we pay you 500. That 160 will count as like, I don't know, you call it a deposit for the next year's kid.

**DEFENDANT:**     Right, so you would go for 420.

**SINGER:**     420.

**DEFENDANT:**     Sorry. Yeah.

**SINGER:**     It would be 340, right?

**DEFENDANT:**     340, sorry [inaudible]

**SINGER:**     [inaudible].

**DEFENDANT:**     I get what you're s-- yes. Yeah [inaudible].

**SINGER:**     Right, so we agree okay, so you, okay with, then we would pay you --

**DEFENDANT:**     Yes.

**SINGER:**     -- 340,000 the following year.

**DEFENDANT:**     Yes. Yeah.

**SINGER:**     Okay, great.  Then I will get that taken care of [it]. Thanks for being patient with me. And it's great -- it's great working with you.

**DEFENDANT:**     Yeah, no problem.

In a call on October 24, 2018, the defendant explicitly acknowledged that the purported sailors being brought to him by Singer were not real recruited athletes:

**SINGER:**     So what I want to -- what I want to touch base with is tomorrow, I'm gonna mail out a check for 160,000.

**DEFENDANT:**     Awesome. Thank you.

**SINGER:**     S-so that'll come out exactly the way you asked for.

**DEFENDANT:**     Uh--

6

**SINGER:**   But what I wanted to -- what I wanted to do was I just want to make sure that we're confirmed that, you know, going forward, I'm going to be able to at least potentially have a spot with you. It'll probably be an athlete like [Student A], who wasn't an actual sailor. And then I'll p--

**DEFENDANT:**  Okay.

**SINGER:**    -- and I'll put together the profile for her, and put all the major regattas that I come up with, from the internet, and bring somebody to you. And then, again, we'll make a payment to you again.

**DEFENDANT:**  Great.

….

**SINGER:**   And then here's the other thing I -- I have a quick question. Maybe you can help me. Now I have another kid, who potentially is fro-- and is potentially -- this is -- wants to be a sailor –

**DEFENDANT:**  Uh--

**SINGER:**    -- lookin' to go East, to sail -- from Seattle.

**DEFENDANT:**  Okay.

**SINGER:**   But I need to create a new profile. And I just have no idea of like -- What are the best regattas that she can participate in? Can you help me with that?

**DEFENDANT:**  Yeah, sure. And she's a -- a Northwest sailor? So she's Seattle?

**SINGER:**   Yes. Yes.

**DEFENDANT:**  Okay. And--

**SINGER:**   If you c-- if you could email me some of those, that would be fabulous.

**DEFENDANT:**  Yeah. Yeah.

**SINGER:**   Uh--

**DEFENDANT:**  No problem.

**SINGER:**   And then, just going forward, again, I will bring you another student athlete just like [Student A], who's n-not a -- a sailor but [inaudible] make things work, 'cause she'll be really a student -- if that's okay.

7

**DEFENDANT:**   Yeah. No, that's fine.

On October 25, 2018, Singer mailed the defendant a check for $160,000, payable to the sailing program the defendant ran.  A few days later, the defendant sent, via e-mail, a list of regattas to Singer, so that Singer could include them in a falsified athletic profile for the applicant he had described in the October 24 call.

On February 5, 2019, law enforcement agents interviewed the defendant at his home. Although the defendant initially denied that he had designated students as athletic recruits in exchange for the payments from Singer, he ultimately acknowledged that he had done so, that he had not disclosed his *quid pro quo* arrangement with Singer to anyone at Stanford, and that he knew that what he was doing was wrong.

    B.   The PSR's Calculation of the Applicable Sentencing Guidelines Is Incorrect

Pursuant to the plea agreement between the defendant and the government, the parties stipulated that the defendant's total offense level under the Sentencing Guidelines is 20, after an adjustment for acceptance of responsibility, resulting in a Guidelines sentencing range of between 33 and 41 months.  The government further agreed to recommend a below-Guidelines sentence of 18 months, and one year of supervised release.  In fact, for all the reasons set forth herein, the government is requesting that the Court impose a lower sentence of 13 months, and one year of supervised release.

The PSR reflects a different calculation, and concludes that the applicable Guidelines offense level is 18, resulting in Guidelines sentencing range of between 27 and 33 months.

In fact, the government respectfully submits that *both* the Guidelines calculation set forth in the plea agreement—which calculates the Guidelines principally based on Section 2B1.1, with enhancements for the bribe amounts agreed to by the defendant and Singer and for the defendant's

abuse of a position of trust—*as well as* the calculation set forth in the PSR—which likewise calculates the Guidelines based on Section 2B1.1, but without any enhancement for loss or gain—are incorrect, and that, for the reasons set forth below, the correct offense level in this case is 21, with an applicable sentencing range of between 37 and 46 months.

The PSR erred in two significant ways.  <u>First</u>, the  PSR erred by improperly calculating the offense level for honest services fraud using USSG § 2B1.1, the general fraud guideline, instead of USSG § 2B4.1, the guideline specifically applying to bribery.  Five circuit courts nationwide, including the First Circuit, have addressed the issue.  *All five* have ruled that Section 2B4.1—not Section 2B1.1—applies to private-sector honest services fraud.  No court has concluded otherwise.  Indeed, the PSR itself recognizes that Section 2B4.1 better reflects the defendant's culpability and is consistent with common sense, and that the PSR's calculation produces an "illogical" result.  PSR p. 43.

<u>Second</u>, the PSR erred by not applying an enhancement for loss to the calculation for either the fraud or honest services fraud predicates, despite the defendant's acceptance of $610,000 in bribes; the parties stipulated to that fact, and so to the 14-level enhancement that the PSR now rejects.  In keeping with this position, paragraph 55 of the PSR concludes that there was "no victim of this offense."  This defies common sense.  The defendant pled guilty to honest services fraud.  That is, he has admitted to violating his fiduciary duties to his employer, Stanford University, and depriving it of his honest services.  He did this by secretly subverting the Stanford admissions process by taking bribes in exchange for securing admission for Singer's clients.  Stanford is certainly a "victim" under Application Note 1 to USSG § 2B1.1.[3]

---

[3] The Government expects Stanford to submit a victim-impact letter on or about June 10, 2019, and a copy of the letter will be filed on the docket.

1.  <u>Applicable Law</u>

Although the government is recommending a sentence well below the Guidelines level as calculated by either the PSR or the parties—and even below the sentence it is entitled to recommend under the terms of the plea agreement—it is critical that the Court correctly calculate the Guidelines before imposing sentence.  The Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005).  Only after correctly calculating the applicable guidelines range can the court "properly exercise its discretion to sentence a defendant within or outside the applicable Guidelines range." *See United States v. Millan-Isaac*, 749 F.3d 57, 66 (1st Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).  The failure to do so is a "serious procedural error" that will "usually require resentencing." *Id*. at 68.

In this case, Vandemoer pled guilty to engaging in a racketeering conspiracy that involved five predicate offenses: mail and wire fraud, honest services mail and wire fraud, and money laundering.  Pursuant to Section 2E1.1 of the Sentencing Guidelines, the base offense level for racketeering conspiracy is the greater of 19 *or* the offense level applicable to the underlying racketeering activity.  Where there is more than one underlying offense, courts should "treat each underlying offense as if contained in a separate count of conviction."  USSG § 2E1.1 Application Note 1.

1.  <u>Honest Services Fraud</u>

As the Information makes clear, the essence of the defendant's crime was his agreement to accept bribes from Singer in exchange for designating applicants as athletic recruits, thereby facilitating their admission to Stanford.  The first paragraph in the manner and means section says

this explicitly, asserting that the conspirators "designat[ed] applicants as purported recruits for competitive college athletic teams, including the Stanford sailing team . . . *in exchange for bribes*." Dkt. 1, ¶ 8a (emphasis added).  The second paragraph notes that the conspirators "conceal[ed] the nature and source *of the bribe payments* by funneling payments through the KWF charitable accounts."  *Id*. ¶ 8b (emphasis added).  Likewise, the paragraphs listing acts in furtherance of the conspiracy repeatedly spell out this *quid pro quo*.  *See, e.g.*, *id*. ¶ 9 (noting that Vandemoer agreed to designate applicant "as a recruit for the Stanford sailing team, *in exchange for a payment to Stanford sailing*") (emphasis added); ¶ 11(alleging that "after Stanford Applicant 1 deferred his application to Stanford for one year, Singer mailed a payment of $110,000 from one of the KWF charitable accounts to the Stanford sailing program *in exchange for* VANDEMOER's agreement to designate Stanford Applicant 1 as a sailing recruit in the following year's recruitment cycle") (emphasis added); ¶ 12 ("In or about the summer of 2018, after Stanford Applicant 1 decided to attend a different university, VANDEMOER agreed with Singer to use that same recruiting spot for the child of another one of Singer's clients ('Stanford Applicant 2'), *in exchange for a $500,000 payment* to the Stanford sailing program.") (emphasis added).

This conduct is chargeable under federal law as honest services fraud, and under state law as commercial bribery.  *See, e.g., California Penal Code* § 641.3 ("any employee who solicits, accepts or agrees to accept money or any thing of value from a person other than his or her employer . . . corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person . . . is guilty of commercial bribery").

Accordingly, the First Circuit, and at least four other circuits, have uniformly concluded what, analytically speaking, should be obvious—that USSG § 2B4.1, the commercial bribery

guideline, applies in cases of private sector honest services fraud, regardless of whether they are charged as honest services fraud pursuant to Section 1346. *See, e.g., United States v. Rybicki*, 38 Fed. Appx. 626, 2002 WL 655214, at *8 (2d Cir. 2002) (affirming sentence under USSG § 2B4.1 where defendant convicted of honest services fraud); *United States v. Montani,* 204 F.3d 761 (7th Cir. 2000) (same); *United States v. Winters*, 62 F.3d 1418, 1995 WL 462415 (6th Cir. 1995) (unpublished) (same); *United States v. Kelly*, 2018 WL 2411593, at *4 (S.D.N.Y. May 29, 2018) (unpublished) (same); *United States v. Hendershot*, 150 F. Supp. 2d 965 (N.D. Ill. 2001) (applying USSG § 2B4.1 where defendant convicted of mail fraud arising out of an illegal kickback scheme and noting that "[t]he government prosecuted this case as a bribery case"); *see also United States v. Josleyn*, 99 F.3d 1182, 1198 (1st Cir. 1996) (applying USSG § 2B4.1 where defendant convicted of conspiracy and mail fraud for conspiring to defraud his former employer by accepting bribes from prospective Honda dealers in exchange for dealership rights); *United States v. Poirer*, 321 F.3d 1024, 1034 (11th Cir. 2003) (applying USSG § 2B4.1 where defendants convicted of wire fraud and conspiracy and noting, "It is certainly true that accepting or providing bribes is inconsistent with the delivery of honest services, but that is not to say that the commercial bribery guideline cannot also be applied to a § 1343 money and property wire fraud case. The defendants' conduct in giving and receiving money in exchange for the misappropriation of documents is 'more aptly' covered by the commercial bribery guideline than by the fraud guideline.").

In *Poirer*, for example, the defendants were indicted for their roles in corrupting the process by which Fulton County, Georgia selected an underwriter for a county project.  Fulton County hired defendant deVegter as an independent financial advisor to help the County evaluate proposals from competing underwriters.  Defendant Poirier was a partner in a firm that was eventually awarded the underwriting contract.   In exchange for $40,000 worth of bribes paid

through an intermediary, deVegter gave Poirer confidential documents that improperly helped Poirier's firm in the competitive proposal process. In determining the Guidelines applicable to this conduct, the Eleventh Circuit *reversed* the district court's decision to apply the Guideline section that is now § 2B1.1, and ruled that § 2B4.1 applied, noting that "defendants' conduct more closely resembled a fraud achieved through bribery than a straight fraud." *Poirer*, 321 F.3d at 1035

More recently, in *United States v. Tanner*, the district court (Preska, J.) applied Section 2B4.1 in a private sector honest services fraud case in which the defendant, a pharmaceutical executive, received a kickback of nearly $10 million in exchange for giving secret guidance to senior executives at a mail-order pharmacy the defendant's employer was negotiating to purchase. *See* 17-cr-00061-LAP (Oct. 30, 2018 S.D.N.Y.) (sentencing transcript) (attached hereto as Exhibit A). In that case, the Probation Department agreed that Section 2B4.1 was the appropriate guideline for valuing the kickback; the court applied the guideline, and enhanced the base offense level based on the $10 million value of the bribe the defendant received. *See id.*

Beyond the fact that every court to consider the issue has concluded that § 2B4.1 properly applies to private-sector honest services fraud, the approach is simply the one that makes sense.

First, it parallels the application of Section 2C1.1 for public-sector honest services fraud, which follows the identical method of calculating the enhancement based on the greater of the value of the bribe or the improper benefit conferred in exchange for the bribe. *Compare* U.S.S.G § 2C1.1(b)(2) ("if the value of the payment, the benefit received or to be received in return for the payment . . . whichever is greatest, exceeded $6,500, increase by the number of levels from the table in § 2B1.1") *with* U.S.S.G. § 2B4.1(b)(1)((B) ("If the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded $6,500, increase by  the number of levels from

the table in § 2B1.1."); *see also Josleyn*, 99 F.3d at 1199 n.15 ("One reasonable explanation for

the two-level difference between the BOL for private bribery, *see* U.S.S.G. § 2B4.1 (level 8), and

public bribery, *see* U.S.S.G. § 2C1.1 (level 10), may lie in the fact that the Sentencing

Commission factored the abuse-of-trust element into the BOL for public bribery only.").

Second, it is consistent with the directive in Section 2B1.1(c)(3) to apply the guideline

covering the conduct set forth in the count of conviction where that conduct establishes an

offense specifically covered by another guideline.  *See, e.g., Poirer*, 321 F.3d at 1035 ("We get

to § 2B4.1 by applying § 2F1.1, which is the guideline specifically associated with the offense

conduct. Application Note 14 of § 2F1.1 is essentially a cross reference that sends us to § 2B4.1.

We are not improperly 'borrowing ... from other offense guidelines,' but instead are applying the

offense guideline and its Application Note.").  That is, the Guidelines, reasonably enough,

provide that courts should apply the Guideline most applicable to the misconduct the defendant

actually committed (here, bribery).

Likewise, it is consistent with the directive in Section 1B1.2(a) to use the most analogous

guideline for "statutory provisions," like Section 1346, that are "not listed in the Statutory

Index."  *See, e.g., Montani,* 24 F.3d at 769 ("Although Montani was convicted of mail fraud, the

government, Montani, the probation officer and the district court agreed that he should be

sentenced under the bribery guideline because his offense conduct more closely resembled a

fraud achieved through bribery than a straight fraud.  *See* United States Sentencing Guidelines

Manual § 1B1.2(a) (allowing the sentencing court to apply the guideline 'most applicable to the

offense of conviction.')").

Third, it is consistent with the purpose of the Guidelines to achieve a just result, and

appropriately reflect the defendant's culpability, to apply a bribery guideline in a case involving

fraud committed via bribery, and to measure the harm based on the value of the bribe or the improper benefit conferred.  By contrast, the PSR's approach—which concludes that the bribe amount has no impact on the calculation of the Guidelines—means that a defendant who receives a $10 million bribe will have the *same* offense level under the Guidelines as a defendant who receives a $10,000 bribe, while a defendant who commits a fraud that causes a loss of $6,501 will have a *higher* offense level than a defendant who pays or receives a $65 million bribe.  That cannot be correct.

The government respectfully submits that the arguments set forth in the PSR for rejecting the application of Section 2B4.1, and applying instead the general fraud guideline, Section 2B1.1, are wrong.  Indeed, the PSR itself recognizes "that it may intuitively seem to make common sense to apply a bribery guideline in a private-sector honest services fraud case involving bribes," and that "the bribery guidelines, which focus on the value of the bribe or the improper benefit conferred, may appear to better reflect culpability." PSR p. 43.

First, the PSR concludes that it is bound to apply Section 2B1.1 because that is one of two guidelines specifically referenced in the statutory index to the Guidelines for Sections 1341 and 1343, the general mail and wire fraud statutes, while Section 1346, the honest services fraud statute, is not listed in the statutory index.  But the Guidelines specifically say that, where a "statutory provision" is "not listed in the Statutory Index," the Guidelines are to be calculated by using "the most analogous guideline."  *See* USSG § 1B1.2.  Here, because Section 1346 is not listed in the statutory index, and because the defendant pled guilty to accepting bribes in exchange for violating his duty of honest services to his employer, the "most analogous guideline" is Section 2B4.1, the commercial bribery guideline.  The commentary to that Guideline even says that it "applies to violations of various federal bribery statutes that do not

15

involve governmental officials." *See* USSG § 2B4.1, background.  Moreover, even if USSG § 2B1.1 did control, that Guideline also provides that where the "conduct set forth in the count of conviction establishes an offense specifically covered by *another guideline* in Chapter Two (Offense Conduct), apply that other guideline."  U.S.S.G. § 2B1.1(c)(4) (emphasis added).  Here, the conduct explicitly set forth in the count of conviction—private-sector honest services fraud— *is* specifically covered by another guideline in Chapter Two of the Guidelines:  Section 2B4.1.

Next, although the PSR acknowledges, as it must, that five circuit courts support the application of 2B4.1 for honest services fraud—and fails to find *any* contrary opinion from *any* court[4]—it nonetheless insists that the cases cited by the government "do not support the government's apparent position that USSG §2B1.1 would *never* apply to honest services fraud. Further, none of those cases stand for the proposition that all private party (non-public) honest services fraud cases should be calculated under §2B4.1."  PSR p. 39.  But the issue for decision is *not* whether Section 2B4.1 applies to *all* private-sector honest services fraud cases.  The issue is simply whether it applies *here,* and the government is baffled as to why the Probation Department would try so hard to avoid applying multiple circuit-level decisions that all address this issue and all reach the same conclusion.  This is, explicitly, a bribery case.  Consequently, Section 2B4.1 is the "most analogous guideline," and thus the one that the Court should apply pursuant to Section 1B1.2 and Section 2B1.1(c)(4).  Whether Section 2B4.1 applies to *other*

---

[4] In a footnote, the PSR cites *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997), for the proposition that the court applied what is now Section 2B1.1 "where the defendant was convicted of mail fraud and honest services mail fraud in a 'degrees-for-contracts' scheme." PSR p. 40 n.6.  The PSR's characterization is based on a misreading of *Frost*, which only considered the Guidelines calculation for a single count of that indictment, charging the defendant with defrauding the government.  *Id*. at 391-92.  *Frost* did not consider or even reference the Guidelines calculation for the defendant's conviction for honest-services fraud, because that was not an issue on appeal.

cases alleging private-sector honest services fraud—or whether, in some instances, Section 2B1.1 might be a better fit—is irrelevant to Vandemoer's sentencing.

Moreover, the government is *not*, in any event, arguing that Section 2B4.1 necessarily applies in every case of private-sector honest services fraud. The government's position is that where the *core* conduct for which the defendant is being sentenced is accepting bribes in derogation of his duties to his private-sector employer, the bribery guideline applies. A contrasting example makes the point:  in *United States v. Hauptman*, Judge Posner applied Section 2B1.1, not Section 2B4.1, because that case was *not* "merely a case in which a bribe deprives the employer of the employee's undivided loyalty," but rather "a case in which bribery was the means used to defraud the employer of a substantial amount of money."  111 F.3d 48 (7th Cir. 1997).  Posner rejected the government's decision to "acced[e]" to the application of the bribery guideline, rather than the general fraud guideline, where the bribes totaled between $5,000 and $10,000, and yielded a Guideline level of 10 under Section 2B4.1, but the fraud loss totaled between $120,000 and $200,000, and yielded a higher Guideline level of 14 under Section 2F.1 1 (the predecessor of Section 2B1.1).  *Id*.  His opinion, however, *presupposed* that Section 2B4.1 would have controlled had the case been one where, as here, the crux of the allegation was the use of "a bribe [to] deprive[] the employer of the employee's undivided loyalty."  *Id*.

Indeed, in *Montani*, decided three years later, the Seventh Circuit affirmed the application of Section 2B4.1 where the "offense conduct more closely resembled a fraud achieved through bribery than a straight fraud."  *Montani,* 24 F.3d at 769 (emphasis added).

The PSR's contention that the government has failed to address how a court should decide between applying Section 2B4.1 or Section 2B1.1 is also incorrect.  The cases on which

the government relies provide that the Court should look at the offenses of conviction and the underlying conduct in making that determination. *See, e.g., id.* ("Although Montani was convicted of mail fraud, the government, Montani, the probation office and the district court agreed that he should be sentenced under the bribery guideline because his offense conduct more closely resembled a fraud achieved through bribery than a straight fraud."); *see also United States v. Anderson*, 85 F. Supp. 2d 1084, 1104 (D. Kan. 1999) (noting that "the government has consistently prosecuted this case as a bribery case, not a fraud case. For example, the Superseding Indictment uses the terms 'bribe,' 'bribes,' or 'bribery' thirty-four times, but only 'fraud' or 'defraud' twice. Although this case does involve some elements of fraud, it is predominantly a case of bribery and conspiracy to commit bribery."). Here, as noted, *both* the offense of conviction—private-sector honest services fraud—*and* the underlying conduct—accepting bribes to facilitate the admission of students to college, confirm that the bribery guideline is the better fit.

On a related note, the PSR's contention that "the central scheme alleged in the relevant charging documents seems to fit more as a fraud scheme than a bribery scheme," PSR, p. 41, is facially wrong. The defendant pled guilty to a racketeering conspiracy whose animating feature is bribery. At the defendant's plea hearing on March 12, 2019, he admitted that: 1) he had a fiduciary duty to Stanford; 2) he accepted bribes; and 3) in exchange for the bribes he agreed to designate certain students as sailing recruits without regard for their sailing ability. *See* March 12, 2019 Tr. at 15-17. The PSR also incorrectly contends that "what makes this case unique is that it is not illegal for a university to provide an admissions slot to someone who provides a significant financial contribution to a school. What makes this a crime is that coaches, parents, and others engaged in fraud and misled these universities about the admissions slots and the

abilities and accolades of the students they admitted." PSR p. 41.  In fact, under the honest-services fraud prong of the charges in this case, it *is* illegal for a university coach to secretly provide an admissions slot to a candidate in exchange for a financial contribution—whether that money is paid to a university fund, as in Vandemoer's case, or to the individual directly—because in doing so, the coach is defrauding his employer of its intangible right to his honest services.  What makes this case unique is not merely that the applicants' athletic abilities were falsified, but also that university employees, like Vandemoer, recruited unqualified applicants in exchange for secret bribes.

Finally, the PSR contends that the honest-services fraud cases applying Section 2B4.1 are distinguishable because in those cases, "the fraud was committed in a commercial setting" while, here, the "bribes were not committed for the purposes of obtaining any commercial advantage." PSR p. 42.  To the extent this distinction even matters, it is incorrect.  As an initial matter, the guideline itself contains no requirement that it apply only in "a commercial setting," nor do any of the cases applying it contain that requirement.  Rather, the commentary to the guideline provides, flatly, that it "*applies to violations of various federal bribery statutes that do not involve governmental officials.*"  *See* USSG § 2B4.1 background.  In any event, Stanford is a major research university which receives tens of millions of dollars in federal grants and is one of the largest employers in Northern California.  The parents who conspired to bribe Vandemoer and other coaches did so precisely to gain a lifelong commercial advantage for their children in the form of a degree from an elite university.  And the defendant, too, benefited, insofar as the bribes were paid, at his direction, to a fund he controlled, which benefited the team he managed, and thus enhanced his standing within the university and his career—all of which he has admitted.

19

Every case to address the issue, the Guidelines themselves, and common sense, demonstrate that Section 2B4.1 appropriately applies to this case. The base offense level for the honest services RICO predicate should be 8, as reflected in that guideline, with an increase of 14 levels based on the amount of the bribe payments. The government affirms, however, that pursuant to the plea agreement, the defendant should receive the benefit of the lower base offense level of 7 set forth therein.

    1.  <u>Mail and Wire Fraud</u>

With respect to the loss figure applicable to the mail and wire fraud predicates, the PSR incorrectly concludes that the defendant's conduct caused no loss to Stanford, the victim institution, and rejects the parties' stipulation in the plea agreement that the loss amount was between $550,000 and $1.5 million, resulting in a 14-level enhancement.

As a general rule, loss under Section 2B1.1 is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A); *see also United States v. Innarelli*, 524 F.3d 286, 290 (1st Cir. 2008). While "actual loss" is the reasonably foreseeable loss that actually resulted from the offense, *see* U.S.S.G. § 2B1.1 cmt. n. 3(A)(i), "intended loss" is the loss that the defendant could have reasonably expected to occur at the time he perpetrated the fraud. *See Innarelli*, 524 F.3d at 290; *see also United States v. McCoy*, 508 F.3d 74, 79 (1st Cir. 2007). Section 2B1.1 requires that the court "make a reasonable estimate of the [intended] loss." U.S.S.G. § 2B1.1 cmt. n. 3(c), and provides several factors to consider in rendering that estimate, including, but not limited to: (1) the fair market value or replacement cost of the property unlawfully taken; (2) the cost of developing proprietary information; (3) the cost of repairs; and (4) more general factors, such as the scope and duration of the offense and revenues generated by similar operations. *See id.* at cmt. n. 3(C)(i)-(iii) & (iv).

In the instant case, Stanford, an elite university, suffered cognizable harm from one of its employees secretly handing out coveted recruitment spots to unqualified applicants based on fake credentials and representations. This fraud caused both tangible and intangible harm to the university. From a purely pecuniary perspective, those losses included, but were not limited to, the following:

- Tuition to Stanford does not cover the full cost of attending the university, and the university loses money on every student it admits. Accordingly, had the students the defendant conspired to admit actually attended the university, Stanford would have unknowingly subsidized the education of students it would not have admitted in the absence of fraud.

- The defendant secretly agreed to sell recruitment slots for approximately $500,000. Had Stanford chosen to auction off admission to the university in a fair and competitive open market, the price would undoubtedly have been far higher. *See, e.g., United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010) (in bid-rigging case, potential loss is the amount above the fixed price that another bidder might have decided to pay for the property had the bidding been fair and open). Accordingly, Stanford was defrauded of the amount for which it could have sold admission, had it chosen to do so.

- Stanford paid the defendant his full salary even though the university would have terminated him had it known he was secretly accepting bribes to recruit unqualified applicants, thus working against the interests of the university.

- Had the scheme succeeded, Stanford would have suffered reputational harm from admitting unqualified students, which would over time have reduced the perceived value of a Stanford education. (Indeed, Stanford's reputation has likely suffered significant harm from the mere disclosure of the defendant's scheme, even though the scheme was interrupted before any students the defendant purported to recruit actually matriculated.)

- Stanford incurred the cost of retaining attorneys to conduct an internal investigation into the defendant's conduct once it was uncovered.

To be sure, the dollar value of the harm to Stanford, and the value of admission to the university, is difficult, if not impossible to calculate. But that does not mean there is no loss, as the PSR contends. To the contrary, in such circumstances, it is appropriate to use "the gain that resulted from the offense as an alternative measure of loss." USSG § 2B1.1, cmt n. (3)(B); *see also United States v. Stroupis*, 530 F.3d 82, 86 (1st Cir. 2008) (using gain as an alternative measure for

loss is appropriate, but only if there is a loss that cannot reasonably be determined). Here, the parties agree that the gain to the defendant from the offense was the $610,000 in bribes that he either received, or expected to receive in exchange for his agreement to sell admission to Stanford. *See* PSR ¶ 53. Pursuant to Section 2B1.1, a gain of more than $550,000 but less than $1,500,000 increases the base offense level by 14. *See* U.S.S.G. § 2B1.1(b)(1)(H). The resulting adjusted offense level for the mail and wire fraud predicate is 23 (including a two-level enhancement for the abuse of a position of trust, but not the applicable three-level reduction for acceptance of responsibility).[5]

C.    The 3553(a) Factors Merit a Sentence of 13 Months.

In fashioning an appropriate sentence, this Court is required to consider the factors set forth in 18 U.S.C. § 3553(a), including the "seriousness of the offense" and the need to provide "adequate deterrence to criminal conduct."

As an initial matter, the government acknowledges that specific deterrence is not a critical factor in sentencing this defendant. It is unlikely that Vandemoer would run the risk of doing this again, even in the unlikely event that he is ever again entrusted with recruiting students for a collegiate team.

At the same time, considerations of just punishment and general deterrence militate in favor of a meaningful prison term. On the facts of this case, a term of imprisonment of 13 months is sufficient, but not greater than necessary, to satisfy those requirements.

The defendant's crimes are serious—he took over half a million dollars in bribes to get kids with fake credentials admitted to the school that employed him. Entrusted with the

---

[5] This result would precipitate a commensurate increase in the Guideline level for the money laundering predicate, pursuant to USSG § 2S1.1(a)(1).

responsibility and discretion to recruit elite sailors to the sailing team of one of the world's premier universities, the defendant secretly abused that position of trust by twisting it to his own advantage Recognizing the immense value of admission to Stanford, he secretly sold that coveted property in exchange for hundreds of thousands of dollars that he directed to accounts he controlled.  While the defendant did not profit financially from his crimes in a directly measurable way—and the government concedes that this is an important point in assessing moral culpability for the offense—his actions nonetheless enhanced his own status within the university, gave him more money to use for the sailing program he implemented, and furthered his career.  In short, as Vandemoer has admitted, he did benefit personally, and would not have otherwise committed the crimes.

Overall, the corrupt scheme in which the defendant willingly participated has shaken the nation and further undermined trust in the college admissions process.  Since charges were announced on March 12, 2019, thousands of newspaper articles have been published about the crimes in which the defendant and his confederates engaged.  Many have focused on the anger of qualified applicants who were improperly denied admission to elite universities.  Others have cited the disgust of current students that their classmates were admitted through cheating and fraud, making a mockery of their own hard work and sacrifice.  As one Stanford student lamented in a March 15, 2019 article in the *New York Times*:  "I worked so hard to get admitted into the school," and to "find out someone had exploited the system and tried to buy their way in was so disheartening."[6]  Another article quoted an executive director of the American Association of Collegiate Registrars and Admissions Offices as noting that the charged behavior "compromises the integrity of college admissions and reinforces stereotypes that people of privilege can

---

[6] https://www.nytimes.com/2019/03/15/us/college-admissions-scandal-students.html

circumvent the rules,"  even as it "undermines public confidence in our institutions."[7]   And

Stanford's own President and Provost described the effect the criminal scheme has had on the

University, writing in a blog post: "We know that this episode has jarred the trust of many

Americans in the college admissions process, and it has prompted many questions from the

Stanford community."[8]

In short, the scheme validated a national fear that admission to elite institutions of higher

education is rigged.  The crimes of the defendant and his co-conspirators confirmed, for many, the

worst of what they had long suspected: that hard work and sacrifice matter less than money and

the access it buys.  These issues were not lost on the defendant as he agreed to accept $610,000 in

bribes from Singer.  The defendant worked for an elite university, and worked in recruiting athletes

to attend.  He knew the supreme value applicants and their parents place on a Stanford slot, as he

knew the social and professional value such a slot conferred.

In sentencing of the defendant, the Court has the opportunity to help redress these wrongs.

The defendant, when he was approached by agents in February 2019, admitted that what he did

was immoral and wrong.  He then promptly pled guilty to the crimes with which he was charged.

The government's recommended sentence recognizes his acceptance of responsibility and the

contrition he has shown.

At the same time, a term of incarceration is required in light of the defendant's betrayal of

his own employer, his willing participation in a broad scheme to corrupt the admissions process,

and the systemic harm his actions have helped to cause.  From a public and general deterrence

---

[7] https://www.insidehighered.com/admissions/article/2019/03/18/look-how-indictments-shook-college-admissions

[8] https://www.sfchronicle.com/bayarea/article/Following-scandal-Stanford-announces-new-13710004.php

perspective, a term of incarceration is also needed to show that such crimes, when uncovered, will yield real, concrete sanctions, and to ensure that others in comparable positions of trust think twice before engaging in this kind of misconduct.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of incarceration of 13 months, followed by one year of supervised release.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     */s/ Eric S. Rosen*
ERIC S. ROSEN
JUSTIN D. O'CONNELL
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
Assistant United States Attorneys

Date: June 7, 2019