iau2tanS kjc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4             v.                           17 Cr. 61(LAP)

 5   GARY TANNER

 6   ANDREW DAVENPORT,

 7             Defendants.

 8   ------------------------------x        Sentence

 9
                                            October 30, 2018
10                                          10:05 a.m.

11
     Before:
12
                      HON. LORETTA A. PRESKA,
13
                                            District Judge
14

15

16                          APPEARANCES

17
     GEOFFREY S. BERMAN
18        United States Attorney for the
          Southern District of New York
19   BY:  RICHARD A. COOPER
          AMANDA K. KRAMER
20        Assistant United States Attorneys

21

22   WILMER CUTLER PICKERING HALE & DORR, LLP
          Attorneys for Defendant Tanner
23   BY:  BRENDAN R. McGUIRE
          HOWARD M. SHAPIRO
24        MATTHEW R. GALEOTTI
          CLAIRE GUEHENNO
25
```

iau2tanS kjc

```
                              APPEARANCES
                             (continued)


KOSTELANETZ & FINK, LLP
     Attorney for Defendant Davenport
BY:  SHARON L. McCARTHY


                    - and -


POLSINELLI PC
     Attorneys for Defendant Davenport
BY:  MARY CLARE BONACCORSI




ALSO PRESENT:

SHAPIRO ARATO, LLP
     Appellate Counsel for Defendant Davenport
BY:  ALEXANDRA  A. E. SHAPIRO


COVINGTON & BURLING LLP
     Attorneys for Valeant
BY:  NANCY L. KESTENBAUM


SPECIAL AGENT MICHAEL PREIS, F.B.I.
```

iau2tanS kjc

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE COURT:  United States v. Gary Tanner and Andrew |
| 3 | Davenport. |
| 4 | Is the government ready? |
| 5 | MR. COOPER:  Yes.  Good morning, your Honor.  Richard |
| 6 | Cooper and Amanda Kramer for the government.  With us at |
| 7 | counsel table, F.B.I. Special Agent Michael Preis. |
| 8 | THE COURT:  Good morning. |
| 9 | MS. KRAMER:  Good morning, your Honor. |
| 10 | THE COURT:  Counsel for defendant Tanner. |
| 11 | MR. McGUIRE:  Good morning, your Honor.  Brendan |
| 12 | McGuire, Howard Shapiro, Matthew Galeotti, and Claire Guehenno |
| 13 | on behalf of Mr. Tanner.  Mr. Tanner is here with us, as well. |
| 14 | THE COURT:  Yes, sir.  Good morning. |
| 15 | Counsel for Mr. Davenport. |
| 16 | MS. McCARTHY:  Good morning, your Honor.  Sharon |
| 17 | McCarthy.  I am here with Mary Clare Bonaccorsi and also |
| 18 | Mr. Davenport. |
| 19 | THE COURT:  Yes, ma'am.  Thank you. |
| 20 | Mr. McGuire, have you and your client had adequate |
| 21 | time to review the presentence report? |
| 22 | MR. McGUIRE:  We have, your Honor. |
| 23 | THE COURT:  Is there any reason it should not be made |
| 24 | a part of the record? |
| 25 | MR. McGUIRE:  No, your Honor. |

1          THE COURT:  Are there any objections to the report?

2          MR. McGUIRE:  None other than were previously included

3    in our prior written submissions to the court, your Honor.

4          THE COURT:  Do you folks want to discuss loss amount

5    at this point?  Obviously you have all put in materials on it,

6    and I think the question is whether or not, under 2B4.1, we are

7    taken back to the 2B1.1 guidelines and thus the 20 points.

8    That's the question.

9          Ms. McCarthy.

10         MS. McCARTHY:  Your Honor, we certainly put in our

11   submissions that we don't believe that there is a loss here;

12   that we have proven in fact that Valeant earned quite a lot of

13   money off of the work that Philidor did; that in fact the

14   purchase price for Philidor was below its purchase price value

15   and was bought at a bargain by Valeant.

16         So we are not contesting that there was a verdict here

17   against our clients --

18         THE COURT:  But here is the question.  I am focusing

19   on the bribery, commercial bribery guideline, which

20   specifically talks about the value of the bribe --

21         MS. McCARTHY:  Yes, we understand.

22         THE COURT:  -- and doesn't that take us to the 9.7,

23   which then takes us to the 2B1.1 guideline, which gives us the

24   20 points?

25         MS. McCARTHY:  That is correct, your Honor.

iau2tanS kjc

1           THE COURT:  Okay.  There is no way around that

2    point --

3           MS. McCARTHY:  Right.

4           THE COURT:  -- regardless of what we think about the

5    other counts of conviction.

6           MS. McCARTHY:  We were not aware that the government

7    was going to be referring to 2B4.1 when we made our sentencing

8    submissions, your Honor.  I believe that that's an accurate

9    reading of 2B4.1 and that is the value of the payment, 9.7.

10          Loss is relevant for other issues that we will be

11   discussing, including towards restitution, which your Honor has

12   given us time to brief.

13          THE COURT:  Yes, ma'am.  I was looking at page 10,

14   footnote 3 of the government's submission.  I guess one of the

15   reasons that I ask this question is if we agree as to that, I

16   think there doesn't need to be further findings on loss or

17   restitution at this point in time and you people can be heard

18   on all of that in due course.

19          MR. McGUIRE:  Your Honor, I think that may be true.  I

20   would just want to add for the record, though, the government

21   on page 6 of its submission, in footnote 2, cites to the *Kelly*

22   case, which is a Judge Sweet opinion, which does, as the

23   government indicates, apply to 2B4.1.  However, I would say in

24   that opinion Judge Sweet's point of reference is loss.  He

25   talks explicitly about loss because 2B4.1 references us back,

iau2tanS kjc

1   as your Honor stated, to 2B1.1.  As your Honor stated, the

2   language in 2B1.1 speaks in terms of the amount of the bribe,

3   but I would just note that in that opinion the focus then

4   became loss to the victim.

5        THE COURT:  Okay.  I understand that you people might

6   not necessary and probably don't agree that that is a loss

7   amount, particularly in connection with the honest services

8   count of conviction, but I think that 3D1.2(b) and 3D1.3

9   instructs us to take the highest guideline of the grouped

10  counts of conviction and, thus, under the commercial bribery

11  guideline, we are stuck with the 20 points.  Isn't that right?

12       MS. McCARTHY:  We are of that view except for the 9.7

13  million.  Valeant presented in its victim impact statement, and

14  I'm sure the court hasn't had a chance to focus on that,

15  because we are not dealing with that right now, $8 million as

16  an alternative theory which the government puts forward in

17  footnote 3 as well.  So we would ask the court, instead of 9.7,

18  to use the 8 million, which results in an 18-point, rather than

19  a 20-point, enhancement.

20       THE COURT:  All right.  What is the government's

21  position on all of this, please?

22       MS. KRAMER:  Good morning, your Honor.

23       THE COURT:  Yes, ma'am.

24       MS. KRAMER:  Mr. Cooper will be handling the bulk of

25  the sentencing proceeding today, but I will address this issue.

iau2tanS kjc

1          2B4.1 is unequivocal that the question for the number

2     of levels to be increased using the table in 2B1.1 is to be

3     based on the greater of the value of the bribe or the improper

4     benefit to be conferred, so what is paid as a bribe or a

5     kickback or what is received in exchange.

6          We are taking a fairly conservative view that the

7     bribe is the greater amount in this case.  I think all of the

8     litigation -- a lot of the litigation that has taken place in

9     cases applying 2B4.1 is where the bribe or kickback is less

10    than the amount received, which we are avoiding that litigation

11    by taking the conservative view, but there is no world in which

12    the value of the bribe in this case is less than 9.7, and the

13    improper benefit conferred is either larger than that or you

14    use the bribe amount.

15         The use of 2B4.1 was in the government's response to

16    defense counsel's objections to the PSR and was in the final

17    PSR.  And the case law is very plain.  There are a couple of

18    cases, including *Kelly*, where the court uses loss as a

19    shorthand but is still applying the principle of 2B4.1 and

20    looking at the value of the bribe or the improper benefit

21    conferred.

22         There is no authority to the contrary that loss,

23    pecuniary harm to a victim is what should be applied under

24    2B4.1.  The government has not seen any and defense counsel

25    have not cited any.  So there seems to be not a substantive

1    objection to this.

2               THE COURT:  Anything else on that point, please?

3               MR. McGUIRE:  Not from us, your Honor.

4               MS. McCARTHY:  No, your Honor.

5               THE COURT:  All right.  Thank you, then.

6               Relying, then, on Section 2B4.1, I adopt, and I am

7    looking at --

8               MS. McCARTHY:  Your Honor, we have some objections to

9    the PSR.  I don't know if you want to do our objections before

10   going into the findings.

11              THE COURT:  All right.  I am doing Mr. Tanner now.

12              MS. McCARTHY:  Sure.

13              THE COURT:  I thought I would do Mr. Tanner first --

14              MS. McCARTHY:  Absolutely.  I wasn't sure how you were

15   doing it.

16              THE COURT:  -- and then move to you.

17              MS. McCARTHY:  Perfect.  Thank you.

18              THE COURT:  Okay.

19              Anything else, Mr. McGuire, that you wanted to object

20   to?

21              MR. McGUIRE:  No, your Honor.  Thank you.

22              THE COURT:  With respect to the offense level

23   computation, I accept the finding of the presentence report set

24   forth at paragraphs 37, and as I say, through and including

25   paragraph 40, which refers to 2B4.1, so I accept the findings

iau2tanS kjc

1 of the presentence report set forth at paragraphs 37 through 48

2 which conclude that a total offense level of 32 is appropriate.

3          With respect to the defendant's criminal history, I

4 accept the findings of the presentence report set forth at

5 paragraphs 49 through 55, which conclude that a criminal

6 history category of I is appropriate.

7          Mr. McGuire, I have an avalanche of paper.  I hope

8 that you will not ask me to recite every one of the letters and

9 the follow-up letters that you people have sent me, but suffice

10 it to say that I have a great package of material.

11          MR. McGUIRE:  Thank you, Judge.  We added to that in a

12 minimal fashion this morning by giving your Honor a one-page

13 late arrival --

14          THE COURT:  Yes, sir.

15          MR. McGUIRE:  -- by Ms. Mary Ramsey.

16          THE COURT:  Yes, sir.

17          Would you like to now speak on behalf of Mr. Tanner?

18          MR. McGUIRE:  Sure, your Honor.  Thank you.

19          Your Honor, to begin today, I would like to thank you,

20 Judge, for the care and consideration that I know you bring to

21 this process and for the courtesies that you have extended to

22 counsel over the past two years.  We have done all that we

23 could to defend Gary, and it was a hard-fought trial.  But as

24 is well known, your Honor ensured that everyone in this

25 courtroom treat each other properly and all parties were

1   treated with respect by your Honor and by everyone in chambers,

2   so thank you.

3       I would also like to note at the outset my respect for

4   the AUSAs on the case.  While I continue to disagree with

5   certain views that Ms. Kramer and Mr. Cooper had of the case

6   and of Gary, as I believe they know, it is their positions that

7   I take issue with, not them personally.

8       My experience over the years before your Honor has

9   taught me many lessons, none more important than it is the

10  quality of the argument, not the quantity that moves the needle

11  in this courtroom.  I have taken that lesson to heart today, as

12  I am sure the court is fully familiar with our submissions, so

13  I do not intend to be repetitive.

14      In preparation for today, I have conferred with others

15  with more experience than I and reviewed more sentencing

16  transcripts than I care to admit.  In addition to reinforcing

17  the gravity of today's proceeding, this preparation has also

18  left me unsettled -- unsettled in the knowledge that no matter

19  how many hours we spent preparing for today, on some level we

20  are bound to fail.  We will fail to adequately convey to you

21  the meaning and the impact of Gary's life.  Our submission and

22  presentation to the court about his history, no matter how

23  lengthy or eloquent, cannot compete with a three-week trial of

24  more than a dozen witnesses and hundreds of exhibits focused

25  entirely on his offense conduct.  It may only be natural, then,

iau2tanS kjc

for the offense conduct which spanned a narrow slice of this

44-year-old-man's life to assume disproportionate prominence as

we all think about the appropriate sentence in this case.

But as we all know, each of these factors -- the

defendant's history and characteristics, as well as the offense

conduct -- must be accorded equal consideration under the

statute.  And one could argue that on judgment day, to the

extent any factor should receive special consideration, it

should be the entirety of the one's life, not one chapter in

it.  But that's the way it is, we understand that, and will not

spend more than a few minutes today on Gary's history and

characteristics.  We know this court appreciates that

limitation, but it is certainly clear to me that whatever I say

here today will not do this good man justice.

I will do my best to provide balance to the relatively

dark picture that the government has painted in its submission

to convey the humanity inherent in this tragic part of Gary's

life and the lives of his wife and sons and to ask this court

to consider the fullness and the decency of the life he has led

and the potential good he can do in the future.

Before I begin, I would like to just make three

preliminary points clear for the court.

First, neither our submission nor our presentation

today is intended to retry this case or to pick a fight with

the government about the evidence.  The jury has rendered its

1    verdict and Gary respects the verdict.  By asking the court to

2    consider all of the good that Gary did for Valeant and

3    suggesting that Valeant was not financially harmed by his

4    conduct, Gary is not refusing to accept responsibility.  Gary

5    wholeheartedly accepts responsibility, and you will hear that

6    from him, Judge.  Rather, we, as Gary's lawyers, are trying to

7    highlight the unusual aspects of this case as mitigating

8    factors for sentencing.  By asking the court to also consider

9    the ways in which Gary's performance benefited Valeant, we are

10   not attempting to minimize his intent or his failure to

11   disclose the payments.

12          The government repeatedly notes that the jury rejected

13   certain of the arguments we made in our submission to the

14   court.  Of course some of these arguments were not squarely put

15   to the jury but, more importantly, we are no longer in front of

16   the jury, and we submit that the court can and should seriously

17   consider all of the facts that distinguish this case from every

18   other reported honest services fraud case, including the fact

19   that the efforts of these two men benefited Valeant by hundreds

20   of millions of dollars, which is of course why Valeant directed

21   them to build Philidor in the first place.

22          The second point that we feel compelled to make clear

23   is that, sitting before you today, Gary Tanner more than

24   accepts responsibility for his conduct.  He is genuinely

25   remorseful for his conduct.  He is broken.  Not just sorry that

1    he got caught, but sorry and contrite for his choices and for

2    his lack of transparency with his employer, an employer that

3    provided him with an opportunity to do what he loved doing --

4    building and fixing companies.  Please understand that Gary

5    appreciates the seriousness of his conduct and that he knows he

6    is here today as a result of his own actions.  That is

7    overwhelming to him and will remain with him for the rest of

8    his life.

9            The third and final point, Judge, relates to the

10   sentencing guidelines.  While we recognize that the court, as

11   you just did, as a legal matter must determine the applicable

12   guidelines range, we submit that, as a practical matter, the

13   guidelines are irrelevant to this case.  They fail completely

14   to capture the nature and the nuance of the conduct here, and

15   they are so far out of the realm of the reasonable that they

16   render themselves useless.

17           As we noted in our submission, several respected

18   judges in this district have expressed similar criticism in

19   prior cases that are far less unusual than this one.  As their

20   sentencing recommendations demonstrate, both the government and

21   probation recognize this, so I won't belabor the point.  But we

22   ask the court to ascribe no weight to the applicable guideline

23   range.

24           Instead, when considering the guideline range along

25   with all the other Section 3553(a) factors, we ask the court to

1   do what the government suggests on page 8 of its submission,

2   "to take into consideration your own sense of what is a fair

3   and just sentence under all the circumstances," as the Second

4   Circuit instructed in the *Jones* case.

5        Because the guidelines, Judge, do nothing to guide us

6   in this case, the question of what is a fair and just sentence

7   under all the circumstances here is a more challenging one and

8   is made all the more challenging because there are no analogous

9   cases upon which to rely.  After two years with this fact

10  pattern, like all of us involved in the case know it is an

11  unusual one.  That is one reason why the court had serious

12  questions about the government's theory at the start of the

13  case and when the government's superseded the indictment.  And

14  that is why the government does not cite to a single analogous

15  case in support of its requested sentence, because no such case

16  exists.

17       And that brings me to the key point I would like to

18  focus on today:  The law requires the court to impose a

19  sentence that is sufficient but not greater than necessary to

20  serve the goals of sentencing.  That is the principle with

21  which today's sentence of Gary must be consistent.  The

22  sentence we all know cannot be arbitrary.  Indeed, that is why

23  all of us -- probation, the government and both defendants --

24  have requested sentences of varying degrees well below the

25  guideline range.  The guidelines produce an arbitrary sentence

1   here and an arbitrary sentence is an unjust sentence.  Today's

2   sentence must be principled to be fair and just.

3          So then it begs the question, what is a sufficient

4   sentence in this case?  And if one believes, as the government

5   does, that Gary's sentence can only be sufficient if it is

6   substantially more than two and a half years in prison, what is

7   the principle that renders a shorter term of imprisonment or

8   home confinement insufficient?  Suppose probation had

9   recommended one year.  What then would have been the

10  government's recommendation?

11         There is an ambiguity and an arbitrariness to these

12  numbers, Judge, and I submit that it stems from the challenge

13  of quantifying the real harm here within the context of the

14  many ways in which Gary benefited Valeant as an employee.

15         In the process of engaging in the charged conduct

16  here, Gary and Andy built a company of more than a thousand

17  employees that exceeded Valeant's expectations in terms of

18  performance.  Unlike the typical fraud case, Philidor was not

19  an accounting fiction or an empty storefront.  It was a

20  successful and sustainable business that had a positive impact

21  on the lives of its employees and patients.  And the manner in

22  which it ended had nothing to do with Gary or Andy.  That is

23  why the magnitude of the deprivation of honest services cannot

24  be measured by the amount of money that Andy paid to Gary.

25  That is why this case is so unusual, and that is why a

1    significant sentence here would not be fair or just.

2              To be clear, Judge, we understand and do not seek to

3    minimize the seriousness of the conduct, and there are, of

4    course, real interests that need to be considered in connection

5    with this sentencing, including Valeant's interest and the

6    public's interest.  But can those interests only be vindicated

7    in this case by way of a significant prison term?

8              No matter what the court does today, Gary will

9    experience a life sentence as a result of this case.  He is now

10   a felon whose reputation has been ruined.  He has been living

11   under the weight of this case for more than two years.  And in

12   this day and age, Google will keep him attached to this case

13   for the rest of his life.  He will also spend the balance of

14   his life digging out from millions of dollars of forfeiture and

15   restitution orders.  And as we noted in our submission, even

16   though he has paid $4.7 million in taxes to the government on

17   the $9.7 million he received from Andy, he receives no credit

18   for that under the law.  This will force Gary to earn an

19   additional $4.7 million over the course of his life to satisfy

20   the forfeiture obligation over and above what he received and

21   it permits the government to receive a total of approximately

22   $15 million, even though the payment at issue in this case was

23   for $10, or 9.7 to be precise.  Of course this may be the law,

24   but that doesn't make it fair, and we ask the court to consider

25   that reality as a significant mitigating factor.

1        That brings me to Gary.  We began our written

2   submission to the court with a simple statement:  "Gary Tanner

3   is a good man."  In a sense, nothing more needs to be said

4   about him.  He has handled this tragic chapter in his life with

5   the grace and the dignity of a good man, a man who you would

6   assume was raised in a loving family that instilled within him

7   the values of selflessness, gratitude, and commitment.  But of

8   course that assumption would be wrong.

9        Gary was not raised in a loving family.  Gary suffered

10  as a child.  Gary has asked me not to discuss his upbringing

11  further here today, but the presentence report provides the

12  court with some of what he had to experience as a young boy.  I

13  am sure the court has reviewed that portion of the PSR

14  carefully.  But, Judge, I say it only captures some of his

15  experience because Gary was too overwhelmed during this portion

16  of his interview with the probation officer to provide him with

17  a full account.  But suffice it to say, it is extraordinary

18  that Gary has become the husband, the father, and person he is

19  today after all he had to overcome.

20       I trust that the court has reviewed every letter

21  submitted on Gary's behalf.  They are consistent in the traits

22  they highlight.  They paint a picture of someone who is modest,

23  kind, generous, and for whom family is everything.

24       While it would be my preference to highlight every

25  single one of them, I will direct the court's attention to a

1   portion of just one of them, to a quote that captures the

2   essence of today and the future for Gary more eloquently than I

3   will.  The quote is from the letter written by Chris Hufford,

4   Gary's close friend, who met while the two of them were working

5   at Sears more than 20 years ago.  Judge, it is the first of the

6   four letters we submitted this past Saturday as a supplement to

7   our original filing, and it reads in part, "If his life were a

8   book, this situation would represent only a short and

9   incongruent chapter among an otherwise stellar underdog story.

10  On that note, a trait that I believe relevant to Gary's

11  sentencing is his penchant and skill to analyze past actions

12  and take those lessons forward.  In other words, I have never

13  known Gary to repeat mistakes."

14          Now, in the position I am in today, some lawyers have

15  to compliment their client even though they don't really know

16  their client.  They have to rely heavily on the letters of

17  support because they haven't had the opportunity to spend

18  meaningful time with their client.  That's not the case here.

19          Having spent the better part of the past two years

20  with him, I know this man, Judge.  We are around the same age,

21  and a similar stage of life.  He has trusted all of us for the

22  past two years.  And over that time period every member of our

23  team has done everything we could for him, not because he is

24  our client, but because he is such a good man and because we

25  believe in his fundamental decency.

1        When you have a trial, during the trial and the months

2   of preparation beforehand, you go through the personal

3   experiences of daily life with one another.  You have the

4   opportunity to observe the little things that provide a window

5   into someone's character, sometimes when he doesn't even know

6   you are looking.  You get to meet his wife and witness

7   firsthand the loving partnership they have built.  You overhear

8   him on the phone with his boys trying to avoid talking about

9   why he is in New York again.  You experience the awkwardness

10   when he asks you about your childhood, but then doesn't want to

11   talk about his own.  And perhaps most profoundly, you see and

12   feel another human being experiencing a fear so crippling that

13   he is frequently rendered speechless -- fear of what today will

14   bring; fear that your Honor will see him as nothing more than a

15   liar and a fraud, not for the full person he is; fear that he

16   will have to say goodbye to Jack and Rhett.

17        Certainly it is common for defendants on the day of

18   sentencing to say that family comes first.  For Gary it does

19   not just come first.  There is nothing but family.  He knows

20   life on his own, and he never wants to be alone again.  And,

21   yes, as the government generally points out, it has been his

22   choices that have put him and his family in this position.

23        But unlike so many convicted of honest services fraud

24   who were clearly thinking only of themselves, Gary is

25   different.  His life has been spent building financial security

1    for his family.  He was born with nothing, he was given

2    nothing, and he never had the safety net that so many of us are

3    blessed to have.

4         Just consider how he spent the money that he received

5    from Andy.  He put it into education accounts for his sons and

6    long-term retirement accounts for him and his wife.  Again, no

7    excuses here about the fact that he received the money in the

8    first place, but the manner in which he put the money to use is

9    revealing and relevant.

10        Judge, Jack Tanner is 12 years old and Rhett Tanner is

11   nine years old.  The court will not hear from them today, but

12   today's outcome may impact them more than anyone else.  Unlike

13   their father, they know the love of two caring and attentive

14   parents.  The effect of the removal of their father from their

15   lives, particularly at these ages, will be immeasurable.  Their

16   father is their hero, and he will remain so, irrespective of

17   today, but we ask the court to consider them in fashioning

18   appropriate sentence.

19        I hope, Judge, that my words today have been helpful.

20   As I know this court appreciates, good people can make bad

21   decisions, and this good person screwed up in a serious way.

22   He knows that.  But this is such an aberration, the only

23   deviation from an otherwise law-abiding and inspiring life that

24   will never be the same.  Without spending a day in prison, Gary

25   will be penalized for life as a result of this case.  A

iau2tanS kjc

1    percentage of every paycheck for the rest of his life will go

2    to Valeant.

3            In light of all of this, do the circumstances of this

4    case and his life require that he also spend time in prison?

5    Is there no alternative but to separate him from his wife and

6    sons?  Judge, we submit that there is.

7            Thank you for your time and your patience, your Honor.

8    We ask you to temper justice with mercy and impose the lowest

9    possible sentence on Gary.

10            Thank you.

11            THE COURT:  Thank you.

12            Mr. McGuire, did Mrs. Tanner wish to go next?

13            MR. McGUIRE:  Yes.  Thank you, your Honor.

14            THE COURT:  Good morning, ma'am.

15            MS. TANNER:  Good morning, Judge.

16            THE COURT:  Would you just say your name for the

17    reporter, please.

18            MS. TANNER:  Abbey Tanner.

19            Most people in here know Gary as coworker, client, a

20    defendant, so I wanted to speak of him as a father and a

21    husband.

22            I'm sorry.

23            THE COURT:  Take your time, ma'am.  Mr. McGuire, would

24    you adjust that microphone, please.

25            MS. TANNER:  I sincerely wish that every child could

1   have a father like this man.  The emotional support, the

2   guidance, the nurturing and the discipline that he offers as a

3   father cannot be overstated.  His constant involvement lets our

4   boys know that they matter, that they are loved, that they are

5   cherished.  It brings them a sense of safety and comfort that

6   every child should be afforded.  Perhaps given his own

7   childhood, or what I would consider lack of, he doesn't take

8   fatherhood for granted.  He knows it's an absolutely privilege

9   and an honor.

10          Gary and I assume equal roles in many facets of our

11  life together, but there are some life lessons he is teaching

12  them that I just can't do by myself.  And what comes to mind is

13  Gary's love and respect for me.  He has never viewed myself, or

14  any other woman for that matter, as anything other than an

15  equal.  He leads by example, and he is teaching our boys how

16  women should be treated.  This might sound odd, but that's

17  everything when you are trying to raise two young boys into

18  respectful young men.

19          And I was fortunate growing up to have a loving,

20  supporting father who was always present in my life, and I

21  would give anything for Jack and Rhett to have the same

22  constant, consistent presence.  I want them to continue to be

23  excited for Sunday mornings, because it's Gary who makes the

24  best breakfast, and I want them to continue to be enthusiastic

25  when they come home from their jiu-jitsu classes because it is

1    dad that they run to when they want to show him everything that

2    they have learned.  I want them to continue laughing and

3    experiencing the joy when dad does crazy things that mom just

4    doesn't do, like jump in the pool with his clothes on or take

5    them camping.  And most of all, I want them to continue hearing

6    "I love you" every night when Gary tucks them into bed.  Some

7    of these things may sound trivial and insignificant, but they

8    are not, especially to our boys, because it is those innocent,

9    little moments every day that matter.

10         Jack, as I mentioned in my letter, is our logical

11   pre-teen.  He is sometimes too logical for his own good,

12   because he tends to rely on himself and look inward when he has

13   problems to solve.  Normally Gary and I have placed value on

14   this because we have taught him to persevere when things

15   aren't easy.  However, the hurt I know he will experience if

16   Gary is incarcerated is a problem I know he won't be able to

17   solve no matter how many times he goes over the situation in

18   his head.

19         And Rhett is at that age, at nine, where he is old

20   enough that he wants his independence, but he is still young

21   enough that mom and dad are his world.  Gary is his hero, his

22   confidant and, above all else, Gary is his best buddy.  Where

23   Jack is ruled by his head, our younger son is ruled by his

24   heart, and I know Rhett's heart will undoubtedly break without

25   Gary by his side.  I lay awake at night and wonder what the

iau2tanS kjc

 1   long-term effects will be on our boys if Gary is gone.  How

 2   will their sadness, their anger, their confusion manifest?  And

 3   as a mother, it is hard to imagine your children in so much

 4   pain and not have the ability to fix it.  And I do understand

 5   that Valeant is the victim in this case, but it can't be

 6   overlooked that Jack and Rhett will be the other casualties if

 7   Gary is absent.

 8          And as adults, we are very clear and have an

 9   understanding of finite time.  Gary and I know that good

10   seasons as well as bad seasons will not last forever, but

11   unfortunately children don't perceive time the same way.  So

12   right or wrong, sending Gary away will make Jack and Rhett feel

13   like they're the ones being punished.  And so I humbly stand

14   before you to ask -- beg -- that if you feel additional

15   punishment is necessary after all that our family has lost,

16   that Gary's debt to society be paid without separating him from

17   our boys.

18          Thank you for your time and your consideration, and

19   your patience.

20          Thank you.

21          THE COURT:  Yes, ma'am.  Thank you.

22          Mr. Tanner, would you like to speak on your own

23   behalf?

24          DEFENDANT TANNER:  Yes.

25          THE COURT:  Yes, sir.

1          THE DEFENDANT:  Thank you, Judge Preska.

2          I wanted to start off just by thanking you for your

3     time, your consideration, and your respect during the trial.  I

4     would I also want to thank Ms. Kramer and Mr. Cooper for their

5     professionalism and courtesy during the trial.  This is

6     certainly not a situation that I ever thought I would ever

7     encounter and personally it has undoubtedly been the most

8     difficult period of my life.

9          My entire life has been defined by working hard and

10    caring for my family.  Based on the experiences I had growing

11    up, I ended up being on my own at a relatively young age and

12    putting myself through school and working as hard as possible

13    to build a better life for myself and for my family.  This

14    included sacrificing a significant amount of time with my

15    family, which was dedicated to work, in an effort to achieve

16    financial independence.

17         Prior to this experience, I have never had any

18    interaction with the criminal justice system, and I never had

19    any reason to believe I would.  This has been an incredibly

20    difficult experience for myself and for my family, and I think

21    about why I didn't disclose these payments every day, multiple

22    times a day.  Overall, I regret so much not disclosing a

23    financial interest, and I will regret it for the rest of my

24    life.

25         At this point, my life as I knew it has been greatly

iau2tanS kjc

1   changed, but I have taken a lot from this process.  My primary

2   concern is for my family.  My wife and my two boys mean

3   everything to me, and the thought of being away from them for

4   any period of time is very difficult for me to accept.  I have

5   no choice but to accept the outcome of the trial, but I am

6   begging you to let me stay with my family.  I will do anything

7   the court requires for punishment, but I feel there are far

8   better options for society generally than separating me from my

9   family.

10          I am truly sorry for not disclosing my financial

11  interest, but I ask that you give me a chance to stay with my

12  family during this difficult time and demonstrate how much I

13  can contribute back to society.

14          Thank you.

15          THE COURT:  Yes, sir.  Thank you.

16          Counsel, does it make sense now to move on to consider

17  Mr. Davenport's situation?

18          MS. McCARTHY:  Sure, your Honor.

19          THE COURT:  Ms. McCarthy, have you and your client had

20  adequate time to review the presentence report?

21          MS. McCARTHY:  Yes, your Honor.

22          THE COURT:  Is there any reason it should not be made

23  part of the record?

24          MS. McCARTHY:  No, but we have a couple of provisos.

25          THE COURT:  Yes, ma'am.

iau2tanS kjc

```
1          MS. McCARTHY:  So, your Honor, on page 2 of the
2    probation report, it indicates that Mr. Davenport was arrested
3    and released on the same day, November 17, 2016.  I have
4    provided documents to the government that indicate that that is
5    not accurate.  He was released the next day, November 18, 2016.
6    So we would ask that that be changed on page 2, "release
7    status," indicating that he was released the next day, on
8    November 18.
9          THE COURT:  Any objection?
10          MR. COOPER:  No objection.
11          THE COURT:  Thank you.
12          MS. McCARTHY:  Your Honor, paragraph 86 of the report,
13    I would just ask that it be supplemented.  It talks about
14    Mr. Davenport's tax filings and indicates that there was no
15    record of return filed for years 2014 through 2017.  We
16    submitted yesterday, your Honor, a letter from Alan Gubernick,
17    Mr. Davenport's accountant, indicating that those returns were
18    filed yesterday and that there is no tax due.  The tax had
19    previously been paid.  There was one return showing some tax
20    due, but because of the overpayments in later years, those
21    payments will cover the tax due.  So the net is no tax due.  So
22    that would be our request for paragraph 86, that it be
23    supplemented to indicate that the returns were filed and there
24    is no tax due.
25          THE COURT:  Thank you.
```

 1              Any objection?

 2              MR. COOPER:  No objection to that additional sentence,

 3    your Honor.

 4              THE COURT:  Thank you.

 5              MS. McCARTHY:  And, your Honor, the next is paragraph

 6    77, which actually ties into the forfeiture argument that we

 7    made about the inclusion of the Andrew J. Davenport 2014

 8    irrevocable trust in the items to be forfeited or listed --

 9              THE COURT:  Did you say 77?

10              MS. McCARTHY:  Paragraph 77 indicates that

11    Mr. Davenport personally obtained over $50 million in cash from

12    the sale of Valeant.

13              THE COURT:  Yes, ma'am.

14              MS. McCARTHY:  Mr. Davenport personally received $44

15    million, not over 50.  That number over 50 includes the funds

16    that were paid to the trust; and, as we have set forth in our

17    letter, the chronology does not support that those funds that

18    were provided to the trust as a result of the sale belong in

19    any way to Mr. Davenport.  So we would ask that that be

20    corrected to say 44 million.

21              THE COURT:  Any objection?

22              MR. COOPER:  No, your Honor.  That's accurate.  It

23    would also be accurate to say that Mr. Davenport personally and

24    the trust that he settled obtained over $50 million from the

25    sale.  I think there could be no dispute about that.

1          THE COURT:  Ms. McCarthy.

2          MS. McCARTHY:  Well, I think a separate sentence,

3    perhaps, that the Andrew J. Davenport Irrevocable Trust

4    received over $7 million is fine with us as long as the 50 is

5    changed to 44, your Honor.

6          MR. COOPER:  That's fine, your Honor.  Thank you.

7          THE COURT:  Thank you.

8          Yes, ma'am.

9          MS. McCARTHY:  Did the court want to here us now on

10   forfeiture, or did you --

11         THE COURT:  I don't think so.  Counsel, I understood

12   that, except for the special assessments, we are deferring all

13   discussions of other financial penalties for another day.

14         MR. COOPER:  Your Honor, I thought that we were

15   deferring the restitution discussion for a different day.  I

16   think that the court needs to pronounce forfeiture at the time

17   of sentencing.

18         THE COURT:  Counsel.

19         MS. McCARTHY:  So I will be heard on that?

20         THE COURT:  Yes, ma'am.

21         MS. McCARTHY:  So, your Honor, the primary issue that

22   we have with the proposed preliminary order of forfeiture is

23   its inclusion of this trust that we are discussing.  It is an

24   irrevocable trust.

25         I put forward in our letter of October 29 the

1  chronology that establishes that a gift was completed by

2  Mr. Davenport in January of 2013 of a 6.0 percent interest in

3  Philidor to the 2008 trust, which is the precursor to the 2014

4  trust.  The only difference in these trusts, your Honor, is

5  that in 2014, before the funds were received from Valeant,

6  Mr. Davenport received tax advice that the way that the 2008

7  trust was created, he was personally responsible for its tax

8  obligations, and so his accountant suggested that they change

9  the trust to remove that tax obligation from Mr. Davenport

10  personally and put the tax obligation on the trust.  That's the

11  only change that that resulted in.

12          The fact is that as of January 2013, the irrevocable

13  trust held an interest, 6.0 percent interest, in Philidor.  So

14  I don't know what to say to the government's argument that they

15  just disagree.

16          I have been talking to the government about this now

17  for weeks, Judge.  Last night, after I had gone to bed, they

18  sent a letter, which finally tells us why they don't think that

19  this is correct, that they think that he has an interest in the

20  trust.  They claim that money was paid to him out of the trust,

21  *ipso facto* he owns the assets of the trust.

22          Well, Judge, if the government had looked at

23  Mr. Davenport's UBS account for End Game, which was Government

24  Exhibit 231, they would see there were two payments made in

25  exactly the amount that they are talking about, 1.7 million, to

1   both the Treasury and to the Pennsylvania Department of

2   Revenue.  Those payments were made 1.5 million to the Treasury

3   on April 23, and 200,000 on April 30.  It is my understanding,

4   Judge -- and I have had to cobble this together because, again,

5   when I woke up this morning I saw the letter -- that

6   Mr. Davenport's accountant requires checks to be written for

7   taxes.  He doesn't like to do the electronic payments, like

8   many of us do.  The trust at that point did not have checks for

9   its account.  I don't know why.  So Mr. Davenport paid, with

10  his checks, the trust taxes.  The 1.7 paid to Mr. Davenport

11  from the trust was to reimburse him for those taxes.  And,

12  Judge, I will be happy to give the court the documents that

13  support this, but if the government will look at Government

14  Exhibit 231, which they kindly brought this morning, they will

15  see those two payments that I am talking about in that amount.

16         The other thing that the government argues is that

17  somehow this ties into Mr. Davenport secreting money away that

18  they cannot trace.  After he got $4 million in his End Game

19  account, that they can't trace 3.4 million of it.  Well, that

20  went to purchase the home he lives in now.  He is living in the

21  $3.4 million.  So there is no playing going on here with money.

22  So I don't even know what to say to that.  The government has

23  the documents that would show that those funds were paid for

24  the purchase of his home.

25         Bottom line here, Judge, is that, in 2013, the 2008

1    trust was given, as a completed gift, an interest in Philidor.

2            THE COURT:  Say it again.  Say it again.  Just say it

3    again.

4            MS. McCARTHY:  When Philidor was formed in January

5    2013, which is before the alleged conspiracy began -- the

6    government alleges the conspiracy began in the summer of

7    2013 -- there were people who were given an interest in

8    Philidor.  I have here, Judge, as an exhibit to the Philidor

9    operating agreement -- I am happy to hand it up -- which shows

10   all of the folks who --

11           THE COURT:  I have it memorized from trial.  I just

12   wanted you to tell me what the amount of the trust --

13           MS. McCARTHY:  6 percent.

14           THE COURT:  Thank you.

15           MS. McCARTHY:  And the government has some allegation

16   in its letter of this morning that, unlike the other people who

17   had ownership interest in the trust, the trust didn't put any

18   cash in, so really it is Mr. Davenport's.  I don't know what

19   that means, Judge.  Also, it is not accurate.  There are other

20   owners, at least three other owners, who didn't put any cash

21   in, and the cash was minimal that was put in by any other

22   owner, like $100.  This company was valueless when it was

23   formed in January 2013.

24           So the government can rail against this, but the fact

25   of the matter is that the assets in the trust and the money

iau2tanS kjc

1   that the trust received after the sale to Valeant in 2014

2   belonged to the trust.  Mr. Davenport is not a beneficiary of

3   the trust.  It is an irrevocable trust, meaning once a gift is

4   made to the trust, it cannot be taken back.

5           So, Judge, it is basic trust law.  It is based upon

6   the trust documents.  I have the trust documents here, if the

7   court would like to see them.  But I provided those to the

8   government many weeks ago, and it wasn't until late last week

9   that they called to tell me -- it was Friday -- they had talked

10  about it at the highest level of their offices, and the only

11  answer they have is they don't agree with my position.  And

12  again, last night is the first time they set forth their

13  reasons, and we have rebutted them.

14          THE COURT:  All right.  Who would like to speak to

15  that?

16          MR. COOPER:  I will.  Thank you, your Honor.

17          Just, first, on the timing point, the defendant has

18  had notice since the time of indictment, when the trust was

19  listed as specific property that we would seek to forfeit, that

20  that was our intention, and the letter filed last night was in

21  response to Ms. McCarthy's letter of yesterday.

22          But setting that aside, your Honor, our position is

23  set forth in the letter.

24          I just want to make a few points in response to

25  Ms. McCarthy's arguments.

1        First, the money flow that is laid out in our letters

2   whereby the trust transferred $1.7 million to the End Game

3   account which then sent money to Mr. Davenport's personal

4   account -- by the way, both of those accounts, the End Game

5   account and Mr. Davenport's personal account, Mr. Davenport had

6   sole control.  He was the sole signer on those accounts.  The

7   point there is that money that was in the trust was not beyond

8   Mr. Davenport's control.  It was not solely moved around and

9   paid by the executors of the trust who were Mr. Davenport's

10  wife and his brother, but he had an active role and obviously

11  had access to trust funds at the time, so that the contention

12  that the trust assets were beyond or are beyond his personal

13  control is belied by the bank records.

14       THE COURT:  What do you say to counsel's suggestion

15  that that money was reimbursement for his having paid the trust

16  taxes?

17       MR. COOPER:  Your Honor, I will credit Ms. McCarthy's

18  representation along those lines.  Our point is not that the

19  disposition of the funds was ultimately not for the benefit of

20  the beneficiaries of the trust, it is that the trust assets

21  were not beyond Mr. Davenport's ability to access and to move

22  around.  It wasn't his brother --

23       THE COURT:  How do we know he told them to do it?  Is

24  there any reason to think it wasn't the executor of the trust

25  who said to reimburse him for paying the trust taxes?

1          MR. COOPER:  We have seen no evidence of that, so I

2     can't speak to that fact other than the absence of evidence

3     along those lines.

4          One moment, please, your Honor.

5          THE COURT:  Yes, sir.

6          (Counsel confer)

7          MR. COOPER:  The other point along those lines, your

8     Honor, is that it is true that the trust was listed on the

9     ownership tables as a 6 percent owner of Philidor.  Based on

10    our investigation, every other ownership interest of Philidor

11    was either in response to an investment in Philidor or somebody

12    who had done some work for either Philidor or BQ6, one of

13    Mr. Davenport's earlier --

14         THE COURT:  My recollection is, maybe I didn't

15    memorize it properly, but my recollection was there were some

16    relatives in there someplace.

17         MR. COOPER:  I believe that those relatives had done

18    work for some of Mr. Davenport's prior companies, like BQ6

19    Media.  So it was in response to an investment or essentially

20    sweat equity that was put up by people like Mr. Davenport's --

21         THE COURT:  But not in Philidor.

22         MR. COOPER:  Some of them I believe did early work on

23    Philidor, but everybody did work in some capacity for

24    Mr. Davenport.  The trust falls into neither of those buckets.

25    So both of those facts suggest that this was in fact a tax

1    planning strategy, where Mr. Davenport allocated his assets,

2    his interest between his personal End Game shell and the trust

3    account.  What the proposed order of forfeiture seeks to do is

4    forfeit Mr. Davenport's interest in the trust.  As we note in

5    our letter last night, in a footnote, if the trust can come

6    forward and show that it was a *bona fide* purchaser for value or

7    that it has a valid means to contest the forfeiture, it can do

8    so after the entry of the notice of forfeiture, of the proposed

9    order of forfeiture.  The proposed order includes a mechanism

10   that the trust can follow along those lines.  But that doesn't

11   mean that Mr. Davenport should not be required to forfeit

12   whatever interest he has in the trust, and that's what we are

13   seeking to do here today.

14           THE COURT:  What do you say to counsel's argument that

15   he has no interest in the trust because it was an irrevocable

16   trust?

17           MR. COOPER:  Your Honor, I think his -- I think the

18   facts that we set out in our letter show that it wasn't

19   entirely out of his reach and that he had at least some control

20   over the disposition of the assets here.  So I don't know that

21   it is as easy as Mr. Davenport putting an interest in a trust,

22   in an irrevocable trust, and then being hands-off from that

23   time forward.  That just doesn't appear to be the case.  The

24   money that we traced flows through two of Mr. Davenport's

25   accounts on his way out the door, two of his personal accounts

1    that he had sole control over.

2             THE COURT:  Are those the reimbursements we are

3    talking about?

4             MR. COOPER:  Yes, your Honor.

5             THE COURT:  Thank you.

6             MR. COOPER:  Thank you.

7             MS. McCARTHY:  Your Honor, I can answer the question

8    of how the funds were transferred to Mr. Davenport.  They were

9    transferred at the direction of the trustee of the trust,

10   Matthew Davenport.  And if the court requires, I can get you

11   the documentation that will show that.  Bob Catelli, the banker

12   who handled this matter, is in court today.  I can also get an

13   affidavit from Mr. Gubernick, the CPA, saying that it was at

14   his request that this was done.

15            Look, I have a trust, a lot of people set up trusts,

16   and the idea of a trust is that you set aside assets for your

17   children, for your spouse, for your descendants and that you

18   are hands-off, that you don't control those.  And this trust

19   was set up properly, Judge.  My partner who handles our trusts

20   and estates practice has reviewed these trusts and has gone

21   over them with a fine-tooth comb.  They are proper trusts.  And

22   the result of the way these trusts were set up is -- and the

23   government can't argue against this, because it is literally

24   like explaining why the sun is shining every day, it just is,

25   Judge -- that an irrevocable trust is no longer the grantor's

iau2tanS kjc

1    property.  It is no longer Mr. Davenport's interest once it is

2    gifted.  And, Judge, this is gifted to the trust well before

3    the government claims that this conspiracy began.  So the trust

4    should not be in the picture, Judge.  The trust should not have

5    to litigate this and sit with a frozen account.  It should be

6    able to be used for the benefit of Mr. Davenport's children,

7    who are the beneficiaries of the trust.

8              THE COURT:  Anything else?  Yes, sir.

9              MR. COOPER:  One more point, your Honor.

10             Regardless of whether or not the initial interest in

11   January 2013, the initial 6 percent, was gifted to this 2008

12   trust that, defense counsel's papers point out, in November

13   2014, which was in the middle of the charged offense and just a

14   month before the transfer of the money, during the course of

15   all of these conspiratorial communications, in November 2014,

16   that is when Mr. Davenport created the new trust and the

17   interest was transferred to that new trust, and that's the

18   trust where the money sits today.  So it is just not the case

19   that everything, all of the granting and all of the transfers

20   occurred before the charged conduct.

21             THE COURT:  But they were both irrevocable trusts, no?

22             MR. COOPER:  Correct, your Honor.

23             THE COURT:  Thank you.

24             MR. COOPER:  Thank you.

25             THE COURT:  I find that the contents of the trusts are

1  not Mr. Davenport's property and, accordingly, are not the

2  subject of the forfeiture order.

3          What else?

4          MS. McCARTHY:  That's all, your Honor.

5          Would you like to hear from me?

6          THE COURT:  Yes, please.

7          MS. McCARTHY:  You are probably already tired of

8  hearing from me but --

9          THE COURT:  No, ma'am.

10         MS. McCARTHY:  Thank you, your Honor.

11         I know that the court has read our sentencing brief,

12 so I am going to try not to retread.  It is also an unusual

13 situation for me to have another defendant being sentenced at

14 the same time, so I'm afraid that some of the things that

15 Mr. McGuire said I may go over again, so please forgive me for

16 that.

17         Your Honor, we understand the government's theory of

18 honest services fraud, but we agree with what Mr. McGuire said

19 and do believe that this case is different from other honest

20 services fraud cases, and for that reason, we submit that the

21 court should sentence Mr. Davenport differently from other

22 honest services fraud cases and that an appropriate sentence

23 here would be a period of time served with supervised release

24 as we request in our papers.

25         In every other private honest services fraud case that

1    we have seen, money is paid by a vendor to a company employee

2    in order to entice the employee to give business to the vendor,

3    and that's not what happened here.

4            Here, it was Valeant that had an interest in seeing

5    Philidor succeed, so it entered into that alliance with

6    Philidor in January -- it was formed in January 2013, well

7    before the government claims that a conspiracy between

8    Mr. Tanner and Mr. Davenport was formed.  So Valeant and

9    Philidor had a relationship, the purpose of which was for

10   Philidor to distribute as much of Valeant's product to its

11   customers as it could through its mail order services.

12           So Philidor did exactly what Valeant wanted it to do,

13   and Mr. Tanner assisted in making that happen.  Mr. Davenport

14   was not making secret payments to Mr. Tanner along the way, as

15   we see often private honest services fraud cases; rather, he

16   gave Mr. Tanner a portion of the money that he personally

17   earned from the purchase of the option for Philidor.  And we

18   submit that that fact is very different from the typical honest

19   services fraud case.  And I know the government is going to

20   vehemently object to my comments, but I feel strongly about

21   that, your Honor, and I wanted to reiterate that.

22           We appreciate that there was certain evidence

23   submitted at trial about planning that Mr. Tanner did with his

24   financial planner.  There is no evidence that Mr. Davenport

25   partook in that or understood that that was happening.  We ask

1    that that not be imputed to him.

2           We are not rearguing the trial nor are we asking the

3    court to disregard the jury's verdict or trying to minimize

4    Mr. Davenport's conduct.  He will tell you, as we have said in

5    our brief, that he regrets every day not telling Michael

6    Pearson that he was going to make this payment to Gary Tanner.

7    He is going to have to live with that for the rest of his life.

8    We are asking the court to take the factual distinction here

9    into account in fashioning Mr. Davenport's sentence and it is a

10   distinction, your Honor, that we submit calls for leniency.

11          Your Honor, as you know, we submitted 60 letters of

12   support for Mr. Davenport.  Many of the people who wrote those

13   letters are sitting here in this courtroom, and I thank them

14   for being here to support Mr. Davenport.  I know the court has

15   read everything we have submitted, and there were far too many

16   letters for us to reference in our sentencing brief.

17          Each one of those letters, Judge, tells a little bit

18   about Andy Davenport.  And I have to say I have been doing this

19   for a while, at both sides of the table, and frankly have never

20   been so moved by the stories of a person's many acts of

21   kindness, compassion, and generosity as I have been in this

22   case, and the reflection that those letters have on the life

23   that Mr. Davenport has led.  And I am not overstating it,

24   Judge, when I say that Mr. Davenport's conduct that leads him

25   to stand before the court today is an aberration in the way he

1    has conducted himself throughout his 50 years on this earth.

2            There are so many stories about how he taught and

3    mentored people, people who may not otherwise have gone very

4    far in their personal lives, because of a lack of education,

5    training, or skills.  Andy encouraged those people.  He helped

6    them to take ownership of the work they were doing so that they

7    weren't just employees.  As a result, these people felt pride

8    in what they were doing; and the fact that Andy believed in

9    them, empowered them to meet the challenges of the work he was

10   asking them to do.

11           I know the court read the letter of Valerie Stiltner,

12   who had worked at Philidor's dispensing operations as its

13   supervisor.  After she suffered a stroke that came after a

14   period of disability due to emergency surgery, Andy welcomed

15   her back to Philidor and found a place for her even after she

16   partially lost her vision and movement and her cognitive

17   functions were impaired.  That's extraordinary, Judge.  He told

18   her to and I am quoting from her letter, "have confidence in

19   the abilities she still had instead of focusing on the ones she

20   lost."  I really, frankly, never heard of such encouragement

21   from an employer.

22           These stories go on and on.  Andy contracted out some

23   of Philidor's packaging work to a company that employs adults

24   with special needs, again finding a way to give people who

25   might otherwise have felt worthless a feeling of pride in their

1    work, lifting them up.  There are many letters from Philidor

2    employees who, despite Andy's conviction and the charges in

3    this case, would gladly work for him again.  Judge, that's

4    extraordinary.  That's an extraordinary comment on him as a

5    boss and as a person.  Most people run away from a felon.  I

6    know.  I have tried to bring people in to court or get letters

7    written for many other people.  This is extraordinary.

8            We submitted as Exhibits FF and GG the sentiments

9    written both on a white board at Philidor and in a spiral

10   notebook given to Andy on the day, the last day the employees

11   were going to be at Philidor right after Valeant pulled out of

12   the option deal.  Those sentiments speak volumes, Judge.  They

13   make it abundantly clear that Philidor felt like a family, and

14   the employees were supported by Andy and the other executives.

15   They were supported to work hard, feel pride, and yet attend to

16   their own families the way that Andy attended to his when he

17   needed to, knowing that Philidor would be there for them when

18   their crises passed.

19           Some of the letters are from people Andy lifted up

20   with his support and encouragement who went on to do things

21   they never imagined they were capable of, people like Nick

22   Spuhler, who is here today.  He is the caddy who came to see

23   Andy as a father figure after his own father fell into the

24   spiral of opioid addiction.  From day one, Andy empowered

25   Mr. Spuhler that day on the golf course by asking him:  What do

1    you think?  Making him feel like his views and input mattered.

2    Mr. Spuhler carries that empowerment with him to this day,

3    working at a major healthcare advertising agency, and he

4    credits Andy with preparing him for that challenge.

5           There is Andy's sister-in-law Lauren Brimhall, also

6    here today, who was a failing high school student when Andy met

7    her.  She credits her success both as a writer and an

8    award-winning photographer to Andy's constant support and

9    encouragement, and she poignantly wrote "Andy had faith in me

10   when no one else did and, quite frankly, I will be proving him

11   right until the day I die."

12          That's where I am going to stop on this part of my

13   remarks, Judge.  The stories go on and on, and they are moving

14   and they are important, because they give the court insight

15   into the heart and soul of this man.  He is a good man, he has

16   done a lot of good for other people, and we ask that the court

17   recognize that goodness and show him mercy today.

18          Now, another aspect I would like to touch on, Judge,

19   is Mr. Davenport's health.  We have submitted a number of

20   medical reports that provide the court with the background of

21   Mr. Davenport's health issues as well as current reports about

22   recent tests that show, among other things, that he recently

23   suffered two minor heart attacks and that he has a coronary

24   calcium score that puts him at the highest possible risk for

25   complications, including stroke, heart attack, and sudden

iau2tanS kjc

1    cardiac death.

2              As I am sure the court can appreciate, anyone who goes

3    through this process, including a trial and now sentencing, is

4    under tremendous stress.  Mr. Davenport's heart issues under

5    this sort of stress put him at a higher risk than most other

6    people in his situation.  We have real, significant concerns

7    that if he is sentenced to jail time, he may not survive.  And

8    I don't say that lightly, Judge.

9              But what's remarkable to me, and I'm saddened by it,

10   frankly, is the government's reaction to this information, and

11   I don't understand it.  In the face of the medical evidence

12   that we have submitted, the government's reaction is that our

13   argument is specious and that Mr. Davenport's health issues are

14   a result of his "own poor choices with seemingly no present

15   effort to correct."  It is just a breathtaking position for

16   them to take, Judge.

17             I appreciate, I am a former prosecutor, a trial

18   conviction is terrific.  You are very proud of it, and you are

19   very jealous of that.  You want to protect it and you want to

20   be an aggressive advocate, and I don't challenge their being

21   aggressive advocates.  That is terrific.  But their job is to

22   do justice, Judge, not to crush a man.  And to not take into

23   account real evidence of his health issues, I don't understand.

24   It seems to lack compassion for what are real lifelong health

25   issues.

1    To the extent that the government believes that

2    Mr. Davenport has in some way caused his own health issues,

3    despite the fact that every man in his family has died from

4    sudden heart attacks -- his brother Matt just this past March

5    at the age of 52, his brother Tony at the age of 48 -- I would

6    like to tell the court a few things.

7    First, since September of 2017, Mr. Davenport has had

8    a trainer come to his home three times a week to work with him.

9    They do cardio exercises and strength training.

10   In addition, when he is able to, he plays golf, and he

11   tries to walk as much of the course as he can, despite a very

12   bad back and bad knees, problems that arose starting with his

13   playing football, and later on in life he suffered chronic back

14   problems that weren't solved until very recently, for which he

15   had to take very strong opioid medication.

16   Second, Mr. Davenport is under the care of his

17   personal physician, Dr. Ronald Luber, who works regularly with

18   him on his complex regimen of oral medications and insulin

19   injections which need to be adjusted based on intraday blood

20   glucose readings, and Mr. Davenport measures those himself.  It

21   is fair to say that the daily monitoring that must be done is

22   daunting, and the medical regimen as well.  But Mr. Davenport

23   is committed to this regimen because he wants to stay alive for

24   his wife and his two children and his extended family, many of

25   whom depend upon him for financial and emotional support.

1      Like anyone who works themselves to the bone, as

2   Mr. Davenport has done in his working life, particularly in

3   building Philidor starting in 2013, I think we all know this,

4   kind of hard to stay in good physical shape.

5      In the midst of all of that, Mr. Davenport lost his

6   brother, he lost his father, and he carried the burden of

7   providing for all of his employees and caring for his older

8   brother's children.  He then lost his brother Matt in March,

9   and that added stressor has impacted his health.

10      He is obese, according to Dr. Fisher, but I have

11   talked to his family and his friends.  He has the same body

12   type as his brothers and his father.  So to the extent that's

13   what the government thinks is a result of his poor choices,

14   unfortunately it is a genetic issue.

15      Your Honor, the evidence of Mr. Davenport's health

16   issues speak for themselves and the court, we respectfully

17   submit, should put significant weight on these issues in

18   fashioning an appropriate sentence for Mr. Davenport, which we

19   submit should not include any time in prison.

20      Now, I do want to say this, and this will be

21   embarrassing for Mr. Davenport for me to talk about this here,

22   but I have to do it.  Another aspect of his health that is of

23   concern is his drinking.  His doctor, Edward Fisher, his

24   cardiologist, writes in his report, which is Exhibit D to our

25   submission, Mr. Davenport is clinically an alcoholic.  Perhaps

 1    this is the aspect that the government also thinks is a poor

 2    choice.  If so, I don't know what to say to that.  Anyone who

 3    has dealt with alcoholism in their family or in their life

 4    knows that it is not a choice, it is a disease.  Quickly Google

 5    alcoholism and you will find that right away you see the word

 6    "disease."  Until the alcoholic is able to grapple with it, it

 7    cannot be solved or controlled.  In fact, it is never solved.

 8    Once an alcoholic is always an alcoholic.  Due to the stress of

 9    this case, Mr. Davenport has not had the strength to deal with

10    this issue, and until he has that strength and can face his

11    drinking head on, he will remain dependent on alcohol, and for

12    that reason we ask the court, in fashioning Mr. Davenport's

13    sentence, to require that he participate in alcohol treatment.

14          Finally, your Honor, as is evident, as I said, from

15    the many people here today in support of Andy, he has a very

16    strong community that supports him.  He has lost some friends

17    as a result of his conviction, but his family, many, many

18    former employees, and his longtime friends remain steadfast

19    supporters for him.  On a daily basis, Andy has to deal with

20    the shame of his conduct that led to his conviction.  He had to

21    explain to his young children -- Drew who is fourteen and Jade

22    who is twelve -- what he did that has caused such upheaval in

23    their lives and has caused him tremendous shame and pain.

24          He has been punished by the loss of his stature in the

25    business community.  He has been punished by the possibility

1    that his family may lose its home, his children may have to

2    leave their school, and his wife, who has not worked for 17

3    years, will need to find a job.  He lost his brother Matt while

4    preparing for this case.  As I have said, all of these things,

5    your Honor, constitute punishment.

6            Andy Davenport has led an admirable life.  He has much

7    to give and many people left to lift up.  We ask that the court

8    give him the opportunity to do so and sentence him to time

9    served with supervised release requiring community service and

10   alcohol treatment.

11           Thank you, your Honor.

12           THE COURT:  Yes, ma'am.

13           Ms. McCarthy, did Ms. Milner want to go next?

14           MS. McCARTHY:  Yes.

15           THE COURT:  Yes, ma'am.  Would you say your name for

16   the reporter, please.

17           MS. MILNER:  Gina Milner.

18           THE COURT:  Yes, ma'am.

19           MS. MILNER:  Thank you for this opportunity, Judge.

20           My name is Gina Milner and I am Andy Davenport

21   sister-in-law and friend.  I am here to speak in support of

22   Andy on behalf of his family and friends.  My sister Andy's

23   wife would be standing here if she could but is far too

24   emotional for words.  The pieces of her heart are hanging on by

25   the thread of hope that your Honor will show mercy on her

1   husband for the sake of their children and those that rely on

2   him.

3          Our family is devastated.  I have known Andy for more

4   than 20 years, and I know that he is devastated beyond measure

5   to be sitting before you today awaiting sentencing for what he

6   knows is a terrible error in judgment.  And we are scared,

7   scared of the possibility that the stress of this case and the

8   possibility of a jail sentence may be too much for him to

9   endure.  Andy has serious medical issues, including a

10  congenital heart problem that has plagued his family.  We are

11  scared of losing someone who many of us don't know how to live

12  without.

13         Andy makes the lives of the people around him better.

14  I am sure you have heard it over and over again in the letters

15  submitted to this court in support.  But Andy is kind,

16  brilliant, and generous.  He is a family man and always makes

17  time to prioritize everyone else's needs above his own.  He is

18  hard-working, determined, self-made, and comes from very humble

19  beginnings.

20         THE COURT:  Ms. Milner, maybe slow down just a little

21  bit.

22         MS. MILNER:  Sure.  Sorry.

23         I hadn't known Andy long when I worked with him at

24  Dover Communications along with his father and his two brothers

25  almost 20 years ago.  During that time, I watched them build a

1   successful medical education business, only to bury their

2   father when he was just 63.  The three brothers then sold the

3   business for millions of dollars to Cardinal Health.

4        Not long after, they started yet another successful

5   endeavor in the pharmaceutical industry only to have their

6   eldest brother Tony, a pharmacist and critical to the business,

7   pass away suddenly of a heart attack just 48.  Tony's kids were

8   left without a father, and Andy's mom was devastated.

9        Still grieving himself, Andy had to deal with the

10  reality of so much uncertainty.  His business was in jeopardy.

11  The weight of his employees' livelihoods rested on his great

12  big shoulders, and now he had not only his own family to take

13  care of, but his brother's as well.

14       The only thing bigger than his shoulders is his heart.

15  So Andy did the only thing he knew how:  He took care of

16  everyone.  He, with the help of his only remaining brother,

17  Matt, took care of their mother and their nephews and started a

18  new pharmaceutical marketing firm, BQ6 Media Group, to create a

19  financial vehicle to support all the people who depended on

20  him.

21       Andy went to work, hiring employees, including several

22  people in this room, like Nick Spuhler -- a young man who

23  caddied for him -- me, his two nephews, nobody of whom had any

24  experience in pharmaceuticals.  Andy believed in people he

25  thought had intelligence and determination and took a chance on

iau2tanS kjc

them regardless of experience and he was willing to teach.  In

that moment, he created opportunity.  At the time his nephews

were sad and rudderless kids who I watched charting an unsteady

course.  Andy helped steer them in the right direction, devoted

time to mentoring them, and while he continued to help them

financially, he empowered them by giving them purpose.

        Over the years, Andy has created opportunity for

countless people and not just family, perfect strangers that

many might easily overlook, like waitresses, caddies, and

disabled veterans.  He ceases the best in people, believes in

them, and knows how to motivate, encourage, and inspire them to

see the best in themselves.

        Judge Preska, I hope I am starting to paint the

picture of a man who you know as a convicted felon who many in

society would simply choose to write off, but who I and so many

others know as selfless and determined.

        Over the years, I have also witnessed Andy's

extraordinary generosity, whether it be giving hundreds of

dollars to complete strangers, helping out a friend or family

member or employee who fell on hard times, or even giving an

ownership stake of his company to a young man he mentored,

despite the fact they no longer worked together, with nothing

expected in return.  I have no doubt the court has read many

letters of support submitted on Andy's behalf recounting much

the same.

1        Thus far I have told you about Andy as it relates to

2   my working relationship.  But my true admiration comes from my

3   personal one.  I can't even begin to tell you how much our

4   personal relationship means, let alone what family means to

5   him, especially his children, my niece and nephew.

6        His children are brilliant -- absolutely,

7   mind-blowingly, beautifully brilliant.  I love my sister, but

8   they didn't get that from us.  You don't have to take my word

9   for it either.  You can look at their IQ tests or ask their

10  schools.  Brilliance like that needs guidance and direction.

11  Those kids are capable of anything.  And if I'm convinced of

12  one thing, it's that there isn't a person in this room capable

13  of tapping into that potential and drawing it out other than

14  Andy.  I pray to God and beg you, Judge Preska, to allow Andy

15  to be here for his kids now, in the most formative years of

16  their lives, to mentor and inspire them the way he has for so

17  many others.  To deny his children the opportunity to have

18  their father teach and guide them is to risk having them not

19  realize their full potential, to take that knowledge and

20  channel it with purpose, to do good and amazing things that can

21  make society better.

22        Over the course of the past year since Andy was

23  indicted, he has had to bear witness as the people he loves

24  struggle -- struggle with his conviction; struggle to find work

25  after losing their jobs, jobs that he created -- and he is

1   devastated not for himself, he is devastated because he feels

2   regret and despair that he has caused this pain.  For a person

3   whose life revolves around taking care of others, around making

4   people's lives better, by carrying their burdens, to go on

5   living, knowing that he has caused their pain, is a punishment

6   all its own.

7        But we are suffering differently.

8        I suffer selfishly for the potential loss of my

9   brother-in-law, mentor, boss, and friend.  Throughout my life,

10  I have had nothing to give.  All I have are the words I share

11  with you today.  This is my honest and heartfelt recollection

12  of the years I have spent with one of the greatest human beings

13  I have ever known.

14       We are all suffering.  And as if Andy hasn't suffered

15  enough loss in his lifetime, this year, he lost his last

16  remaining sibling, his best friend, and the only person in the

17  world who could finish his sentences, his brother Matt, at just

18  52.  Another Davenport loss to another sudden heart attack.  He

19  now finds himself with even greater responsibility, playing

20  father to his niece, caretaker to his mother, and facing

21  sentencing for actions I know he wholeheartedly regrets with

22  every fiber of his being.

23       There is one last story I would like to share.

24       I worked with Andy's brother Matt for ten years.  In

25  that time, I had never known Matt to read a book yet somehow,

1    in his own way, he, too, was brilliant like Andy.  Many didn't

2    see his genius, but Andy did.  He drew out the best in Matt.

3    My own son, Cole, who is nine years old, has learning

4    disabilities.  When I see Andy look at my son, I see him look

5    at him the same way he looked at his brother, with a hopeful

6    determination that this kid has something special, and we are

7    going to find it.

8              Education has always been important to Andy, and over

9    the years he has generously contributed to my children's

10   education, but now is no longer in a position to do so.  This

11   year my husband Andy, who worked at Philidor, and I had to take

12   our son out of private school, a school he loved, because we

13   can't afford it after losing our jobs when Philidor collapsed

14   after Valeant pulled out of the deal and BQ6 deteriorated.

15             My son recently wrote a letter to a friend in his old

16   school saying, "Don't worry.  We will always stay friends, and

17   one day I will be back."

18             When I look at Andy and I see the way he looks at my

19   son, he now looks at him with sadness.  He is dying looking

20   into my son's eyes feeling like he let us down, feeling

21   helpless that he can't fix this.  He isn't thinking about

22   himself other than he wishes he could take back the error in

23   judgment he made while working tireless hours to make this

24   world a better place for everyone he loved -- family or

25   otherwise.

1      Just like it is killing him thinking about what that

2   error in judgment did to the reputation of a company he built

3   that provided exceptional service to physicians and patients,

4   to all the people he employed who lament the loss of a company

5   they loved, stress it has caused his family, those that depend

6   on him for financial support and guidance, especially his

7   children who have suffered being ridiculed in school, who saw

8   their dad plastered on the front page of the *Enquirer* as a

9   convicted criminal.

10      When I tell you Andy is brilliant, hard-working, and

11   selfless, it is because I witnessed firsthand a man with so

12   much grit and intellect put his head down and work like an ox

13   to pay people's salaries even when it meant money out of his

14   own pocket before we ever turned a profit.  I watched him turn

15   a situation that would have devastated most and create

16   something better than before.  I watched him carry the sadness

17   of loss, the burden of faltering business, and the weight of

18   all of these people and heave it up on his six-foot shoulders

19   and plow ahead, never echoing a word of self-doubt or

20   self-pity.

21      Andy is suffering.  He is devastated.  But his only

22   concern is for his family -- his wife, his kids, his mother,

23   two nephews, and his niece -- who depend on him.  How will they

24   survive without him?

25      Given his family history, I have been asking myself:

1   What is the likelihood of him surviving jail?  He just suffered

2   two mild heart attacks and is at risk every day of a fatal

3   heart attack.  He is, without question, paying the price each

4   and every day for his choices and has for the last three years.

5   Any time in jail for Andy could literally mean a life sentence.

6           Your Honor, Andy's life is literally in your hands.

7   You are the only person in this room that gets to decide just

8   punishment.  As my last plea to you, on behalf of myself, all

9   of his family and friends that support him here today, they are

10  all here despite his conviction, I beg you not to incarcerate

11  him.  Please show leniency.  My hope is that one day in the not

12  so far off future you will hear about his children, about his

13  nieces and nephews, including my own two kids and say to

14  yourself, I gave one man a second chance, and because of that,

15  these children who depend on them left the world a better

16  place.

17          The man I know may be a convicted felon in the eyes of

18  the law, but the man I know, if given the opportunity, will

19  never quit in his pursuit to turn his God-given abilities to

20  into possibilities for others.

21          Thank you.

22          THE COURT:  Yes, ma'am.  Thank you.  Ms. Milner, would

23  you be kind enough to give the reporter your notes?  She will

24  return them to Ms. McCarthy.

25          MS. MILNER:  Would you like me to approach?

iau2tanS kjc

1          THE COURT:  Yes, ma'am.  You were a little speedy.

2          Mr. Davenport, would you like to speak on your own

3     behalf?

4          DEFENDANT DAVENPORT:  Yes, your Honor.

5          THE COURT:  Yes, sir.

6          DEFENDANT DAVENPORT:  Thank you, your Honor, for the

7     opportunity to speak here today.

8          I deeply regret giving money to Gary Tanner, and I

9     take full responsibility for the consequences of my poor

10    judgments and actions.  I had many opportunities to discuss my

11    intention to pay Gary with Mike Pearson, Valeant's CEO, and

12    seek formal approval for doing so.  I did not, and I will

13    forever regret that poor decision.

14         I apologize to this court.  I apologize to Valeant,

15    and the many good employees who I encountered over the years.

16    I apologize to the good people who worked with me at Philidor

17    and who took such pride in the work we did.  I know that their

18    association with Philidor is now tarnished because of my

19    actions.

20         Family has always been the most important thing in my

21    life.  I have let down those who I care for and who depend upon

22    me the most.  I will spend the rest of my life attempting to

23    atone for the damage that I have done to them.

24         Thank you, your Honor.

25         THE COURT:  Yes, sir.  Thank you.

1          Off the record.

2          (Discussion off the record)

3          THE COURT:  May we hear from the government now,

4    please.

5          MR. COOPER:  Thank you, your Honor.

6          At the outset, I would just like to address the

7    comments from both defendants, from Mrs. Tanner, Mrs. Milner,

8    and defense counsel.

9          It is quite clear from the letters submitted to the

10   court and from all of the comments today that these two men had

11   an impact on their families and communities.  That much is

12   absolutely evident.

13         And it is clear that any sentence will have collateral

14   consequences beyond just these two men.

15         It is also clear that Mr. Davenport has serious health

16   issues.  We understand that.

17         We thought carefully about our sentencing

18   recommendation in light of all of the letters and the documents

19   that were submitted to the court, which is how we came to our

20   ultimate sentencing recommendation.

21         To be clear, your Honor, there are collateral

22   consequences in any sentence, in any case, any sentence that

23   the court hands down.  They are of course regrettable.  But as

24   the court is well aware, they are the consequences not of the

25   court's actions, but of the defendants' actions, of their

iau2tanS kjc

1    conduct.

2            Here today, your Honor, I want to speak to a few

3    issues.  I want to first address a couple of specific arguments

4    that defense counsel made.  I want to talk to the seriousness

5    of this offense and the need, the particular need here for

6    general deterrence.

7            So first I want to address the guidelines argument

8    that Mr. McGuire made.  He urged the court to reject the

9    guidelines and to give them no consideration.  Your Honor, the

10   guidelines here are narrowly tailored to the precise offense,

11   to the payment of the bribe, to the size of the bribe.  This

12   was not an insignificant payment for Mr. Davenport to

13   Mr. Tanner.  This was nearly $10 million.  The guidelines

14   recognize that, and that's what they are based on.  So this is

15   not a case where the potential magnitude of loss is perhaps

16   difficult to see at the outset and that drives the numbers.

17   Here, it is the actual offense conduct that both defendants

18   were well aware of at the time.

19           Both defense counsel suggest also, your Honor, that

20   this is a very unusual case.  That was a theme running through

21   both counsel's remarks.  This is not an unusual case.  This is

22   in the heartland of honest services fraud cases.  Money was

23   paid for improper benefit.  This was not merely an undisclosed

24   payment, but it is clear from the evidence at trial that

25   Mr. Davenport purchased significant assistance with that $9.7

1    million, secret assistance.

2             The starkest example that the court may remember from

3    trial was during the negotiations of the option agreement.

4    This was a situation where Mr. Davenport sat on the opposite

5    side of the table from Valeant, where a dollar more here is a

6    dollar less there, and Mr. Tanner provided back-channel

7    information to Mr. Davenport about Valeant's position and then

8    commented to Mr. Davenport and helped Davenport craft his

9    response to Valeant's negotiating position.  That is an

10   improper benefit bought and paid for that is similar to many

11   other honest services fraud cases.

12            This is also in the heartland of honest services fraud

13   cases because of the steps that the defendants took to conceal

14   their activity, which shows their understanding of its

15   wrongfulness at the time, in the use of shell companies, the

16   use of multiple layers, the use of secret alias e-mail

17   accounts, and fake business cards.  Those are steps that took

18   place over many, many months.  This wasn't one single

19   undisclosed payment, but it was a course of conduct over a

20   period of time.

21            Your Honor, this is a serious case.  Companies like

22   Valeant cannot monitor everything that their employees do and

23   everything that their vendors do.  They try.  In this case

24   there were codes of conduct, there were certifications, and

25   even when Laizer Kornwasser who, as the court may remember, had

iau2tanS kjc

1    suspicions that Mr. Tanner was close to Philidor, Kornwasser

2    raised them up the ladder, and Mr. Tanner was given specific

3    instructions on maintaining independence from Philidor.

4            But in light of all that, your Honor, in the face of

5    all that, the defendants chose to lie and deceive again and

6    again and violate the trust that Valeant placed in them.

7            Honest services fraud is serious, your Honor, in light

8    of all that, because the whole system depends on the level of

9    trust between companies and their employees.  And here, when

10   you have a publicly traded company, where there are

11   shareholders who are at risk, they can't monitor everything

12   that happens.

13           Now, both defendants -- both defense counsel have

14   suggested in their submissions and also in their oral advocacy

15   today that the defendants accept responsibility and shouldn't

16   have made the payment, the undisclosed payment.  But that, your

17   Honor, is not acceptance of responsibility or demonstration of

18   remorse here because the crux of the crime is not merely the

19   undisclosed payment.  The crux of the crime is all the

20   deception that had happened for months, if not a year and a

21   half, before that undisclosed payment.

22           They also suggest in different ways that this was a

23   victimless crime, that Valeant benefited, that Philidor

24   benefited, that everybody benefited.  Well that's not the case,

25   as the court is aware, in two respects.

1          First, there was pecuniary harm here.  We lay out the

2     facts in our submission.  I know the court has the submission

3     from counsel for Valeant who I understand is in the courtroom

4     today and, on behalf of the victim, would like to address the

5     court prior to sentencing.

6          But there was actual pecuniary harm in a number of

7     different ways, all because of the promise of the payment and

8     all because of this back-channel communications.  I'm not going

9     to address the pecuniary harm in more detail here, but I also

10    want to talk about the intangible harm, because that's, as

11    well, the crux of an honest services fraud case such as this.

12         Companies like Valeant as I said earlier have the

13    right to depend on the honest services of their employees, and

14    violations like this one go to the very heart of that trust.

15    There is an intangible nonpecuniary harm that crimes like this

16    one wreak.

17         I want to say just a few more words here, your Honor,

18    on the topic of general deterrence.

19         Crimes like this are difficult to detect, particularly

20    when defendants use layers of companies and transfers between

21    bank accounts, between multiple bank accounts, and use

22    different e-mail accounts and fake names.  Crimes like this are

23    necessarily conducted in secrecy, and these two defendants

24    conducted their crime in secrecy.  Crimes like this take

25    significant investigative resources to detect, to charge, and

1   to bring to justice.  And so the need for general deterrence is

2   important in part because the cost of these crimes can't be too

3   low.

4          At bottom, this was a crime where there were two men

5   who already had a lot of money and who were earning a lot of

6   money and who engineered a scheme to get even more.  It was a

7   calculation: commit a crime, engage in all the subterfuge in

8   order to make a big payday, and it is clear that the defendants

9   thought at the time that their chances of getting caught were

10  low.  The court will remember an e-mail introduced into

11  evidence where they compared themselves to Butch and Sundance

12  and talked about riding off into the sunset and continuing to

13  play the game.  It is quite clear they didn't think that they

14  would get caught.  They conducted a cost-benefit analysis, and

15  they obviously thought that the potential risks, the potential

16  costs were not significant enough to deter them from acting.

17         People at companies, your Honor, are watching what

18  happens here today because there are people who are invested

19  with trust and discretion at those companies and engage in the

20  same sort of cost-benefit analysis as these defendants engaged

21  in at the time, and those, those are the people who need to be

22  deterred.  Today's sentence, we respectfully suggest, can serve

23  as a general deterrent message to all those people who might be

24  thinking of engaging in conduct like this, of violating the

25  trust that was placed in them, that they cannot and they must

1   not corrupt their positions.

2           With that, your Honor, we will rest on our submission.

3   Thank you.

4           THE COURT:  Yes, sir.  Thank you.

5           Mr. McGuire.

6           MR. McGUIRE:  Your Honor, I realize before we move

7   forward we have not addressed the forfeiture order with respect

8   to Mr. Tanner.

9           THE COURT:  Yes, sir.

10          MR. McGUIRE:  So I just wanted to do that for the

11  record.

12          With respect to the government's proposed forfeiture

13  order, on page 3 of that, and I will give your Honor an

14  opportunity to get there, page 3 is where the bank account --

15          THE COURT:  Paragraph what?

16          MR. McGUIRE:  It is -- it is basically paragraphs (a)

17  through -- it carries on to (h) which list the assets that are

18  the subject of the order.

19          THE COURT:  Yes.

20          MR. McGUIRE:  Mr. Tanner has no objection to the

21  account listed in paragraph (a).  That contains proceeds from

22  the payment and it is in Mr. Tanner's name.  We would, for the

23  record, object to the remaining listed accounts because those

24  either have proceeds -- or funds in them that are independent

25  of the payment that was made by Mr. Davenport to Mr. Tanner

iau2tanS kjc

1    and/or they are jointly held by Mrs. Tanner, and so Mrs. Tanner

2    intends to make a claim with respect to some of those funds.

3    So we would just note that objection to, again, it is (b)

4    through following on to page 4(b) through (h).

5              THE COURT:  And I take it that she will do so in the

6    procedure that's set out here?

7              MR. McGUIRE:  That's correct, Judge.

8              THE COURT:  Yes, sir.  Thank you.

9              Are there victims present who wish to be heard?

10             MS. KESTENBAUM:  Yes, your Honor.

11             THE COURT:  Ms. Kestenbaum.

12             MS. KESTENBAUM:  If I may.  May I use the podium?

13             THE COURT:  Yes, ma'am.

14             MS. KESTENBAUM:  Thank you.

15             MR. COOPER:  Your Honor, I'm sorry.  I believe, in

16   going through the PSR, the court had adopted the PSR with

17   respect to Mr. Tanner but not explicitly with respect to

18   Mr. Davenport.  We just ask that that be done prior to imposing

19   sentence.

20             THE COURT:  It is.  You are correct.

21             Forgive me for a minute, Ms. Kestenbaum.

22             With respect to Mr. Davenport's offense level

23   computation, I accept the findings of the presentence report

24   set forth at paragraphs 37 through 48, which conclude that a

25   total offense level of 30 is appropriate.  And in so doing, I

1   rely on my earlier remarks with respect to paragraph 40, citing

2   Section 2B4.1(b)(1)(B).

3          With respect to the defendant's criminal history, I

4   accept the findings of the presentence report set forth at

5   paragraphs 49 through 55, which conclude that a criminal

6   history category of I is appropriate.

7          Thank you, Mr. Cooper.

8          MR. COOPER:  Thank you, Judge.

9          THE COURT:  Ms. Kestenbaum.

10          MS. KESTENBAUM:  Thank you, your Honor.  Nancy

11   Kestenbaum, of Covington & Burling, on behalf of the company

12   formerly known as Valeant Pharmaceuticals, now known as Bausch

13   Health Systems.

14          Your Honor, thank you for the courtesy and opportunity

15   to be heard today and throughout these proceedings.  I will be

16   brief.

17          To be clear, other than restitution, which we

18   understand the court is not addressing today, the company takes

19   no position on any specific sentence or sentences that the

20   court should impose.

21          But I want to be clear here.  The defendants have

22   argued before trial, at the trial, and today that because they

23   were good at their jobs and because Valeant's relationship with

24   Philidor was successful for a time, that Valeant wasn't harmed

25   by their crimes.  As Mr. Cooper just said, what they are saying

iau2tanS kjc

1    is that essentially this was a victimless crime.  But that is

2    not true.

3            Valeant was harmed by the defendants' conduct.

4    Valeant was harmed financially, which is why the company is

5    seeking restitution, but not just financially.  The defendants'

6    betrayed Valeant's trust, which means that the defendants

7    betrayed the trust of the company, the trust of its management,

8    of its shareholders and, perhaps most importantly, betrayed the

9    trust of the company's other employees, employees who also work

10   hard for the company but who don't steal from it just because

11   they think they deserve it.

12           As Mr. Cooper just said, in this way, this case is

13   just like every other honest services case, and we ask that the

14   court take this into account in fashioning an appropriate

15   sentences here.

16           Thank you.

17           THE COURT:  Yes, ma'am.  Thank you.

18           Are there any other victims who wish to be heard?

19           Does anyone wish to add anything?

20           Thank you, counsel.  Thank you, counsel, particularly

21   for your excellent submissions and for your oral presentations

22   today.

23           Counsel, some things I am going to say will apply to

24   both defendants and I think it will be clear which do and which

25   are specific to one defendant.

1          In general, with respect to the nature and

2     circumstances of the offense, certainly you have heard that I

3     have calculated the guidelines and take them into account.

4     Here, however, I agree with Judge Sullivan, where he said in

5     *United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y. May 2,

6     2013), "There is a lot of talk about the sentencing guidelines

7     these days, particularly in fraud cases, a lot of suggestion

8     that the guidelines are overly mechanical, and that they are

9     out of whack in many cases, and I think that's probably true.

10    I think in many cases, if left to themselves, if that were the

11    only thing, then the guidelines can lead to sometimes absurd

12    and certainly unjust results."

13         They certainly would have in *United States v. Joseph

14    Collins*, 07 Cr. 1170, where the proposed guidelines sentence

15    was four levels below life.  The guidelines are an especially

16    imperfect proxy in a case of private sector honest services

17    fraud like this one.  The crime here, as counsel have

18    discussed, is the employee's deprivation from his employer of

19    its intangible right to the employee's honest services.  That

20    crime is untethered to any financial loss or harm to the

21    employer.  The amount of money that changes hands is not

22    necessarily an accurate measure of the deprivation of the

23    intangible right to honest services.

24         While financial loss played no role at trial in the

25    determination of culpability, under the sentencing guidelines,

1    it becomes the single most important consideration in

2    sentencing.  Such approach is patently unfair.  As we know,

3    both the probation department and the government have

4    recognized that, and I note that the probation department, as

5    to each defendant, has noted that, without minimizing the

6    seriousness of the offense, given the defendants' familial ties

7    and responsibility and their compliance with the bail

8    conditions, probation believes that a seriously

9    below-guidelines sentence is appropriate.  I agree.

10          With respect to the history and characteristics of the

11   defendants, I note that, unlike so many defendants we see in

12   this courthouse, neither of these defendants became a hard

13   worker after his arrest or became a devoted family man after

14   his arrest.  They both did so throughout their lives.

15          I guess following on Mr. McGuire, I will not discuss

16   Mr. Tanner's childhood in detail, only to agree with his wife

17   that he did not have one and, indeed, had a less than

18   childhood.  Mr. Tanner nevertheless, having had no example of

19   education, went out and educated himself, despite the turmoil

20   in his own life.  He put himself through school, did very well

21   in school, and went forward.

22          We know that Mr. Tanner met Mrs. Tanner while they were

23   both working at Sears, and I note her position that "I get

24   emotional thinking about Gary as a father, especially knowing

25   what he endured during his childhood years.  I often wonder to

1   myself why Gary turned out as great as he did, when so many

2   others in a similar situation go down a different path."

3       I note the letter of Alison Pritchett, who worked first

4   with Mr. Tanner at Valeant before transferring to Philidor, and

5   who says, "I have always known Gary to be an incredibly hard

6   worker and someone whose main priority was to provide for his

7   family.  His wife, Abbey, and boys, Jack and Rhett, are Gary's

8   whole world, and he is devoted to them."

9       Ms. Pritchett adds that "I have worked for many people

10  during my career, and while most of them claimed to be

11  supportive of family priorities, Gary stands out as a person

12  who actually demonstrated by his actions that he embraced this

13  principle."

14      I note the numerous letters with respect to Mr. Tanner's

15  dedication at his son's school and in his community.  The

16  principal of the school writes that, "During my 15 years in

17  education, I have never seen a more dedicated, helpful father,

18  who consistently and selflessly gives up his time and energy

19  for his children's school."

20          An administrative assistant writes, "I have worked at

21  schools for over 30 years and, without a doubt, I have never

22  seen a dad more involved than Gary is with his children.

23  Mr. Tanner's community work was publicly recognized when he

24  received the school's volunteer award."

25      We have heard a great deal today about how hard

iau2tanS kjc

1   Mr. Tanner has worked, and I think there is no one who will

2   take away from that.  Particularly, in growing Philidor, we

3   know that Mr. Tanner traveled back and forth from Arizona to

4   the east coast every weekend for two years.  One of

5   Mr. Tanner's supervisors at Medicis and then at Valeant said,

6   "It is hard to overstate the work ethic I have observed in

7   Gary."

8        Mr. McGuire made mention of the letter received from

9   Chris Hufford, and I note his remark that "I consider Gary to

10  be a wonderful example of how a man should carry himself as a

11  friend, as a citizen, and as a father and husband."

12       Accordingly, I take Mr. Tanner's self-improvement, his

13  hard work, his devotion to family, his devotion to his

14  community, and his charity into account as part of his history

15  and characteristics.

16       With respect to Mr. Davenport, again, Mr. Davenport did

17  not become a hard worker, a family man, and a charitable

18  individual postarrest.  He did that through his entire life.

19       We recall that Mr. Davenport's parents did not attend

20  college, and his brother Tony was the first member of the

21  family to go to college.

22       We also recall that, although Mr. Davenport was

23  accepted at Princeton, Georgetown, and Penn, he chose to attend

24  the University of Richmond so that he could go with his close

25  friend.  He paid for his own education out of student loans and

1    worked 20 hours a week bartending during school.

2            When Mr. Davenport met his wife Kristin, she could

3    hardly believe how hard he worked.  She said, "I quickly

4    appreciated that Andy is the smartest and most hard-working

5    person I have ever met.  He was working so hard, he hardly left

6    the house."

7            Mr. and Mrs. Davenport now have a 14-year-old boy and

8    a 12-year-old girl.  The young man writes, "My dad was with me

9    every step of my childhood, balancing work and parenting, so it

10   never felt like he was away for too long a time.  There were

11   some days he would drive home just to see us for an hour or two

12   before driving all the way back to work until late at night."

13           He continues, "He has always been there to pick me up

14   when I am down, and I feel like I can talk to my dad about any

15   problems I have."

16           Mr. Davenport's daughter notes that "my dad is always

17   there when I need him.  No matter how crazy the idea or how

18   large the task, he will give me help in any way he can."

19           After Mr. Davenport's brother Tony died suddenly at 48

20   years old, Tony's son wrote, "In one day, I lost my protector,

21   my confident, my compass, and my hero.  My Uncle Andy, bearing

22   the loss of his oldest brother, stepped in and saved not only

23   my life, but the life of my young brother, too.  Far beyond

24   providing a roof over both our heads and college educations,

25   Andy is an irreplaceable part of not only my life, but an

1   irreplaceable part of the lives of his wife, Kristin, and his

2   young children."

3          I note the letter filed as Document 207-1 where a

4   young woman who is referred to here as "AM" says, "I understand

5   you may not care about what an 11-year-old girl has to say, but

6   it is really important to me that you take the time to read

7   this letter.  I have known Uncle Andy for my entire life, and I

8   wanted to tell you how much of an impact he has made on me and

9   so many other people.  Whenever I see my Uncle Andy, he always

10  has a big smile on his face, no matter what is happening.  He

11  is always strong for everyone . . . when we first moved to

12  Haverford, along with the Davenports, we had to change schools.

13  I was really excited to be going to a fancy private school,

14  Baldwin.  What I didn't know was that my parents could not

15  afford to pay for that school.  Uncle Andy was kind enough to

16  pay for my Baldwin education and my brother's education, while

17  still paying for his own two kids.  This scenario is one

18  example as to how much of a generous person he is."

19         Michelle Davenport, Andy's brother Matt's widow,

20  writes that when Matt died suddenly in March of 2018, it was

21  Andy who, despite facing an imminent criminal trial, provided

22  emotional support that she so desperately needed.  "The

23  emotional availability that Andrew has afforded my daughter and

24  myself is truly priceless."

25         Andy's mother writes that, after the passing of his

iau2tanS kjc

father and his brothers, "Andrew has continued to be a steady,

supporting influence on his family, not only being a terrific

parent to his two young children ages 14 and 12, but also

stepping in to a father figure role over the past decade with

his two nephews and recently for his niece.  In addition to

supporting his brother's children, Andrew has assumed a

patriarchal role, caring for his mother and ensuring the wider

family has the emotional and financial support it requires."

      One of Kristin's younger sisters, Beth Ann Olesen,

notes that "Andy isn't just generous with his money, he is

generous with his time, his energy, and his attention."

      We have heard at length today about the energy that

Mr. Davenport expended in the various entrepreneurial ventures

he engaged in with his family and friends and employees.  I

note in particular Lynn Langan, an accountant in the finance

department at Philidor, explains "I was Andy's toughest critic.

At the point of hire, I had lost all faith in those that ran

companies, how out of touch they all seemed to be from the

average employee.  But then I started noticing Andy in the

pharmacy building boxes or sitting in a cubicle taking calls.

He continued in the trenches even as the company grew as if a

reminder to stay connected.  He talked to his employees, and

mostly not about work, but rather their lives outside the

walls.  He was interested and wanted them to be successful and

happy.  It was the last part that struck me most, that even

1    though he could sit behind his desk and revel in all the

2    success, he cared more about making sure his employees felt the

3    same way."

4              Peggy Neily, who worked as director of human resources

5    for Philidor for a time, noted that Mr. Davenport was an

6    extraordinary leader, and she listed some of the things that

7    Mr. Davenport did to protect his employees and to help the less

8    fortunate.  Those things included, as counsel have mentioned,

9    extending work to adults with cognitive or developmental

10   disabilities, focusing hiring directives to U.S. veterans and

11   women joining the workforce after raising children, personally

12   matching all charitable donations made by the employees dollar

13   for dollar with no limit, and going well above all requirements

14   to see that the employees who were affected by the closure of

15   Philidor were aided.  More personally, she notes that

16   Mr. Davenport paid for hotel rooms for employees willing to

17   work during snow storms and paid the travel expenses for a

18   young employee to travel to her mother's funeral on the west

19   coast.

20             Counsel has mentioned Ms. Karen Reo, who suffered a

21   stroke, and within 24 hours of Ms. Reo's daughter's notifying

22   Philidor of the situation, she heard back from the HR

23   department that "as per Mr. Davenport, Ms. Reo would be paid

24   her full salary while she is out recuperating."  As counsel

25   have already mentioned, when Ms. Reo returned to the company

1    with various disabilities resulting from the stroke, "Andy was

2    able to carve out a role for me within the company where I

3    could still be effective despite my limitations."

4         I also note the letter from Brett Winters, who was

5    vice president of operations, who explains that the company

6    learned on a Friday that, due to a payroll company error,

7    employee paychecks would not be delivered on time, requiring

8    the employees to wait until the following week.  He sets out in

9    his letter that the banks were closed, there was no way to deal

10   with this, and when he informed Mr. Davenport of the situation,

11   Mr. Davenport gave him the entire contents of his wallet, all

12   of the cash in his safe, and proceeded to borrow cash from

13   close friends so that the employees were paid.

14        We have heard already today about Nick Spuhler, whose

15   father suggested that he start caddying for Mr. Davenport when

16   Mr. Spuhler was 13 years old.  He did that and, as we have

17   heard, Mr. Davenport made him feel as an equal, encouraged him

18   to be somebody some day, gave him a job offer, stuck with him

19   through the financial downturn, and Mr. Spuhler concludes

20   that -- we have heard this sad situation with his father.  He

21   concludes, "In the absence of a father worth emulating, I used

22   my proximity to successful men at the golf club as a ready

23   collection of role models after which to fashion myself.

24   None's influence was more alluring or more enduring than

25   Andy's.  Lucky me that I got to benefit so directly from his

1    years of guidance, generosity, and good will."

2           I also note that from 2001 to 2008 Mr. Davenport

3    served on the board of directors of St. Mary's Villa for

4    Children, filling the board seat made available by his father's

5    untimely death in 2001.  That charity provides residential

6    treatment to boys and girls who manifest mental health problems

7    that cannot be addressed in less structured settings.

8           So in considering the history and characteristics of

9    these defendants, I take into account all of these facts.

10          With respect to the paragraph 2 factors, there is a

11   need for a serious sentence here to reflect the seriousness of

12   the offense and to provide respect for the law.  As we have

13   heard at length from the government, there is a need here to

14   protect companies' right to the honest services of their

15   employees.

16          With respect to paragraph B, I am convinced that there

17   is no need for extensive incarceration to deter either of these

18   individuals.

19          With respect to general deterrence, I agree with

20   Judge Rakoff, who says there is "considerable evidence that

21   even relatively short sentences can have a strong deterrent

22   effect on prospective 'white-collar' offenders."  *United States*

23   *v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (citing

24   Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80

25   (2005) and Elizabeth Szockyj, *Imprisoning White Collar*

iau2tanS kjc

1   *Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); *see also*

2   *United States v. Tomko,* 562 F.3d 558, 573 (3d Cir. 2009)

3   (rejecting government's argument that district court's

4   probation-only sentence in complex securities fraud case would

5   harm general deterrence).

6           In this instance, as we have heard at great length,

7   particularly from the individuals speaking on behalf of these

8   defendants, even a relatively short sentence has a very

9   devastating effect on defendants and certainly has a strong

10  deterrent effect in general.

11          In considering the paragraph D factors, I have taken

12  into account Mr. Davenport's medical situation, which is indeed

13  a difficult situation which requires monitoring.

14          I have in mind the paragraph 3, 4, and 5 factors.

15          With respect to paragraph 6, the need to avoid

16  unwarranted sentencing disparities, of course I am aware that

17  it is my job to take into account nationwide sentences,

18  nationwide cases, not just these cases; however, as I noted

19  with respect to the fraud guidelines, they are truly out of

20  whack at the higher ends, and that is where we find ourselves

21  today.  So to the extent that there is any perceived disparity,

22  it is because of the unworkability of the fraud guidelines at

23  the far end.

24          With respect to paragraph 7, the need to provide

25  restitution, I note that both defendants of course are looking

1    at enormous financial penalties, and thus a very lengthy

2    sentence will deter from their ability to make restitution and

3    thus that argues against requiring a lengthy prison term.

4           Mr. Tanner, counsel, taking all of those factors into

5    account, it is my intention to impose a sentence of a year and

6    a day on Mr. Tanner, followed by a period of two years of

7    supervised release on each count to run concurrently.

8           It is not my intention to impose a fine, in light of

9    the other financial penalties that Mr. Tanner is facing.

10          It is my intention to impose the restitution amount

11   set out in the proposed order of restitution, which is

12   $9,703,995.33.

13          Forfeiture, as we have discussed, will be determined

14   later.

15          MR. COOPER:  Your Honor, I'm sorry to interrupt.

16          THE COURT:  Forgive me.  You are right.  Forfeiture is

17   in the amount I noted.  Restitution is to be determined later.

18          It is my intention to impose the special assessment of

19   $400.

20          It is my intention to provide the payment schedule

21   that is set forth at pages 31 to 32, which talks about period

22   of incarceration and monthly installments at 20 percent of

23   Mr. Tanner's gross monthly income.

24          It is my intention to impose the recommended special

25   conditions of access to financial information and no lines of

1  credit unless he is in compliance with the installment payment

2  schedule.

3          Is there any reason, counsel, why such a sentence

4  should not be imposed?

5          MR. COOPER:  No, your Honor.

6          MR. McGUIRE:  No, your Honor.

7          THE COURT:  Very well, then.  Mr. Tanner, you are

8  sentenced, sir, to a period of incarceration of a year and a

9  day.  Following that time, you will spend a period of two years

10 on supervised release.

11         During that period, you will comply with all of the

12 standard terms and conditions of supervised release.  Among

13 them are that you not commit another federal, state, or local

14 crime, you not illegally possess a controlled substance, and

15 you not possess a firearm or other destructive device.

16         In addition to those and all of the other standard

17 terms and conditions of supervised release, during that period

18 you will provide the probation officer with access to any

19 requested financial information.

20         In addition, you will not incur any new credit charges

21 or open any additional lines of credit without the approval of

22 the probation officer unless you are in compliance with the

23 installment payment schedule.

24         As I mentioned, I do not impose a fine, but impose the

25 forfeiture amount of $9,703,995.33 jointly and severally.

1          During the period of incarceration, if you are engaged

2     in a BOP non-UNICOR work program, you will pay $25 per quarter

3     toward the criminal financial penalties.  If you participate in

4     the Bureau of Prisons UNICOR program at a grade 1 through 4,

5     you will pay 50 percent of your monthly UNICOR earnings toward

6     the criminal financial penalties consistent with BOP

7     regulations at 28 C.F.R. § 545.11.

8          Any payment made that is not payment in full shall be

9     divided proportionally among the persons named.

10          The restitution, upon release, shall be paid in

11     monthly installments beginning 30 days after release.  The

12     installments will be in no less than 20 percent of your gross

13     monthly income.

14          And finally, sir, I must impose and do impose the $400

15     special assessment, and that should be paid promptly.

16          It is my duty to inform you, sir, that, unless you

17     waived it, you have the right to appeal this sentence, and you

18     might have the right to appeal *in forma pauperis*, which means

19     as a poor person, with the waiver of certain fees and

20     expenses.

21          Mr. McGuire, did you wish a recommendation for a

22     designation, or Mr. Cooper did you have something to add?

23          MR. COOPER:  I do briefly, your Honor.

24          I believe the court ordered forfeiture jointly and

25     severally.

1          THE COURT:  You are right.  Not.  I take it back.

2          MR. COOPER:  Thank you.

3          THE COURT:  Forfeiture is not joint and several.

4    Thank you.

5          Mr. McGuire.

6          MR. McGUIRE:  Yes, Judge.  We have explained to

7    Mr. Tanner that the court cannot order a particular facility,

8    but we would ask that your Honor make a recommendation to the

9    Bureau of Prisons that Mr. Tanner be designated to a facility

10   where his family resides in Arizona, where we believe there is

11   FCI Tucson and FCI Arizona.  The preference would be FCI

12   Arizona, but the overall goal here is I think to ensure that he

13   goes to a minimum security camp, and we believe those two

14   institutions in Arizona --

15         THE COURT:  It is the court's recommendation that

16   Mr. Tanner be designated to a facility as close as possible to

17   his home in Arizona, particularly in the light of his having

18   two young children.  It is the court's recommendation that he

19   be designated to FCI Arizona or FCI Tucson.

20         MR. McGUIRE:  Your Honor, we would request a surrender

21   date in late January to allow Mr. Tanner to spend the holidays

22   with his family and get his affairs in order.

23         THE COURT:  Yes, sir.

24         (Pause)

25         THE COURT:  January 31, 2019.

1          MR. McGUIRE:  And your Honor, one other issue, which

2      is a request.  We have raised this with the government.  There

3      is a minor issue with respect to the record and a request that

4      we have with the government that -- the trial record, that is,

5      that we would ask to keep open the judgment for a period of a

6      couple of days this week to see if we can resolve it with the

7      government, and we may come to your Honor with that.  So we

8      just ask for that time.  By the end of the week, we will submit

9      a letter.  We will contact chambers otherwise to update the

10     court.

11         THE COURT:  Thank you.

12         MR. McGUIRE:  Thank you.

13         Then I believe there will be a request for bail

14     pending appeal, but we can handle that after the Davenport

15     sentence is imposed.

16         THE COURT:  Okay.  Was there any reason not to

17     continue it?

18         MR. COOPER:  No, your Honor.

19         THE COURT:  So ordered.

20         Ms. McCarthy, would you remind me, in light of the

21     holding with respect to the irrevocable trust, what the number

22     is.

23         MS. McCARTHY:  The number of what, Judge?

24         THE COURT:  The forfeiture.

25         MS. McCARTHY:  In the forfeiture order?

1              THE COURT:  Yes.

2              MR. COOPER:  Your Honor, sorry.  I believe the number

3    remains the same.  The court can just strike out the specific

4    property of the trust, which is --

5              THE COURT:  What about paragraph 1?

6              MR. COOPER:  The money judgment amount will remain the

7    same in paragraph 1.  On the third page, paragraphs E and F,

8    which are the paragraphs that relate to the specific property

9    and trust, maybe your Honor can just cross those out and the

10   order should otherwise be fine.

11             THE COURT:  Is that okay with you, Ms. McCarthy?  E

12   and F.

13             MS. McCARTHY:  Yes, it is E and F, your Honor.

14             THE COURT:  Yes, ma'am.  Thank you.  Thank you,

15   counsel.

16             You have heard the considerations that I have gone

17   through in thinking about a sentence.  As I said, I am

18   cognizant of Mr. Davenport's health situation, but it is

19   nevertheless my intention to impose a period of a year and a

20   day incarceration with the recommendation that Mr. Davenport

21   spend his time at the highest level medical facility that is

22   available at BOP.

23             It is also my intention to impose a period of two

24   years of supervised release on each count to run concurrently.

25             It is my intention to impose the special conditions

iau2tanS kjc

set forth, starting on page 31, which is a substance abuse

program, mental health program, providing requested financial

information and not incurring new credit charges or additional

lines of credit without approval unless in compliance with the

installment payment schedule.

It is not my intention to impose a fine.

It is my intention to impose the forfeiture amount of

$9,703,995.33.

It is my intention to impose the payment schedule

which is set out at page 33 of the presentence report.

And it is my intention to impose the $400 special

assessment.

Is there any reason, counsel, why such a sentence

should not be imposed?

MS. McCARTHY:  No, your Honor.

THE COURT:  Very well, then.  Mr. Davenport, you are

sentenced, sir, to a period of incarceration of a year and a

day.

It is the court's very strong recommendation to the

Bureau of Prisons that you be designated to the highest level

medical facility that is available.

Following that time, sir, you will spend a period of

two years on supervised release.  During that period, you will

comply with all of the standard terms and conditions of

supervised release.  Among them are that you not commit another

1    federal, state, or local crime, you not illegally possess a

2    controlled substance, and you not possess a firearm or other

3    destructive device.

4           In addition to those and all of the other standard

5    terms and conditions of supervised release, during that period,

6    you participate in an outpatient treatment program approved by

7    the probation officer for substance abuse, and that program may

8    include testing to determine whether you have returned to the

9    use of alcohol.

10          In addition, sir, during that period, you will

11   participate in an outpatient mental health treatment program

12   approved by the probation officer.

13          During that time, you will continue to take any

14   prescribed medications unless otherwise instructed by the

15   healthcare provider.

16          Sir, you might be required to pay some or all of those

17   two programs, depending on your ability to pay and the

18   availability of third-party payment.

19          The court authorizes the release of available drug

20   treatment evaluations and reports and available psychological

21   and psychiatric evaluations and reports, including the

22   presentence investigation report, to the respective healthcare

23   providers.

24          In addition, sir, during that period, you will provide

25   the probation officer with any requested financial information.

1    You will also not incur any new credit charges or open any

2    additional lines of credit without the approval of the

3    probation officer unless you are in compliance with the

4    installment payment schedule.

5             During the period of incarceration, if you are engaged

6    in a Bureau of Prisons non-UNICOR work program, you will pay

7    $25 per quarter toward the criminal financial penalties;

8    however, if you participate in the BOP's UNICOR program, at a

9    grade 1 through 4, you will pay 50 percent of your monthly

10   UNICOR earnings towards the criminal financial penalties

11   consistent with Bureau of Prisons regulations at 28 C.F.R. §

12   545.11.  Any payment made that is not payment in full shall be

13   divided proportionally among the persons named.

14            Following release, sir, restitution will be paid in

15   monthly installments of 20 percent of your gross monthly income

16   commencing 30 days after release.

17            As I mentioned, I do not impose a fine, but must

18   impose and do impose the $400 special assessment, and that

19   should be paid promptly.

20            It is my duty to inform you, sir, that, unless you

21   have waived it, you have the right to appeal this sentence, and

22   you might have the right to appeal *in forma pauperis*, which

23   means as a poor person, with the waiver of certain fees and

24   expenses.

25            Ms. McCarthy, did you want a specific recommendation

1      or what?

2                  MS. McCARTHY:  Your Honor, he lives in the

3      Philadelphia area.  The two medical facilities that are in any

4      way close are both over six hours away.  One is in Devens, the

5      other is in Lexington, Kentucky.

6                  (Defense counsel and defendant confer)

7                  MS. McCARTHY:  He doesn't have a preference, your

8      Honor.

9                  Secondly, your Honor, we would ask that if the Bureau

10     of Prisons determines, based upon an analysis of his medical

11     needs, that he does not require federal medical facility, that

12     the court then alternatively recommend FCI Schuylkill, which is

13     very close to his home.

14                 THE COURT:  It is so recommended.

15                 MS. McCARTHY:  Thank you.

16                 THE COURT:  Did you want the January 31 surrender

17     date?

18                 MS. McCARTHY:  Yes, your Honor, and also we would ask

19     that bail be continued pending appeal.

20                 THE COURT:  Yes, ma'am.  Any objection?

21                 MS. KRAMER:  Yes, your Honor.  We have no objection to

22     bail continuing pending the sentencing -- the surrender date of

23     January 2019, but bail pending appeal is disfavored and only

24     warranted in exceptional circumstances where the court finds,

25     by clear and convincing evidence, that an appeal raises a

1    substantial question of law or fact likely to result in

2    reversal, an order for a new trial, a sentence that does not

3    include a term of imprisonment, or a sentence that is reduced

4    from what the court has imposed.  There is absolutely no basis

5    to reach that conclusion in this case, certainly not by clear

6    and convincing evidence.

7              THE COURT:  Ms. McCarthy.

8              MS. McCARTHY:  Your Honor, if the court would permit,

9    Alexandra Shapiro will be handling the appeal on behalf of

10   Mr. Davenport, and I would ask the court permit her to address

11   this issue.

12             THE COURT:  All right.  Well, the motion is denied

13   now.  As of now, bail is continued through the surrender date.

14   If Ms. Shapiro wants to make a presentation, that's fine.

15             MS. KRAMER:  I understand that Mr. McGuire is making

16   the same motion for bail pending appeal on behalf of

17   Mr. Tanner.

18             THE COURT:  Forgive me.  I thought Mr. McGuire said

19   pending surrender.

20             MR. McGUIRE:  I said both, your Honor.  I asked for

21   the surrender date, then I also said, after the Davenport

22   sentence is imposed, that there would be a request for bail

23   pending appeal on behalf of Mr. Tanner.

24             We are going to yield the floor to Ms. Shapiro, as the

25   arguments that she is going to make we will join in.

1          THE COURT:  All right.

2          Ms. Shapiro.  Yes, ma'am.

3          MS. SHAPIRO:  I will try to be brief, your Honor.  I

4    know it's been a long morning.

5          With respect to the -- I think the government concedes

6    there is no risk of flight or danger, and the sole question

7    before the court is whether we can establish that there is a

8    substantial question that, if resolved in the defendants'

9    favor, would result in reversal or a new trial.

10          The leading Second Circuit case on the matter makes

11    clear that this is not a high hurdle, that "substantial" means

12    a question that is not frivolous, but rather a close question

13    or one that could well be decided the other way or one that is

14    novel and which has not been decided by controlling precedent,

15    and that is *United States v. Randell*, 761 F.2d 122, a Second

16    Circuit decision from 1985.

17          We clearly don't have to prove that the defendants are

18    likely to succeed and this court need not find that it has

19    erred, but merely whether, if we do succeed, a new trial or

20    reversal will be granted.

21          THE COURT:  What about the clear and convincing part?

22    What about the clear and convincing part?

23          MS. SHAPIRO:  Your Honor, I am about to address what

24    the issues are and why they are substantial.

25          So in the first -- we think that there are several

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1      substantial issues which arise in part from the fact that I

2      think everyone has acknowledged, even accepting the verdict,

3      the theory of honest services fraud in this case is highly

4      unusual and that we are unaware of any other case in which a

5      private sector honest services fraud case was not based on the

6      situation described by other counsel, and I won't go on at

7      length about it, in which business is essentially steered to a

8      vendor who makes a bribe or kickback.  I think your Honor

9      acknowledged that even at the oral argument on the motion to

10     dismiss.

11             So we think that, under these unique facts, as well as

12     the Supreme Court's narrowing of the honest services fraud

13     statute most recently in the *McDonnell* case from 2016, give

14     rise to several substantial questions about both fair notice

15     and jury instructions in this case.

16             First, we think there is a substantial question

17     whether the honest services fraud statute is unconstitutionally

18     vague as applied to this conduct.  And I won't go on at length,

19     I know your Honor has ruled on this, but I think, at a minimum,

20     it is clear that that presents a novel question.  The circuit

21     has never addressed it.

22             And I have one that satisfies the substantial question

23     standard.  I think in particular I just would note that in the

24     *Skilling* case the Supreme Court was clear that the statute does

25     not criminalize mere undisclosed self-dealing by a private

1    employee and that something more is required, and that the type

2    of paradigmatic cases of bribes and kickbacks that the court

3    was describing in *Skilling* in context of private services are

4    the types of cases that we all have been talking about, which

5    is not what happened here.  This was very unusual, given that

6    this started because Valeant nurtured a relationship with

7    Mr. Davenport and Philidor, and I won't go through all of the

8    other facts.  The court is extremely familiar with them, more

9    than I am.

10           And I recognize that the court thought very carefully

11   about all of its rulings in the case, but I just respectfully

12   submit that this is, at a minimum, a novel question and

13   therefore satisfies the bail standard.

14           In addition, we think that there are a couple of

15   issues with respect to the jury instruction, particularly with

16   regard to the *quid pro quo*, that are similar to issues raised

17   recently by Sheldon Silver in his argument to the Second

18   Circuit, which was accepted, that he should be entitled to

19   bail, and both of those apply to this case, and there is one

20   other issue I want to mention.

21           So the first question that he raised in his successful

22   bail argument to the circuit was a question about whether the

23   jury charge was deficient because it failed to instruct the

24   jury that there needs to be a *quid pro quo* agreement before the

25   employee took the acts in question, and we think in this case,

1    as well, that the jury instruction, in particular with respect

2    to Mr. Davenport, failed to convey that the jury had to find

3    that Andy Davenport paid Mr. Tanner a kickback with the

4    understanding that the payment was made in exchange for

5    specific actions by Mr. Tanner.

6            This requirement of an agreement which, as I said, the

7    Second Circuit found was at least substantial in the *Silver*

8    case, is dictated by a long line of cases from the Supreme

9    Court and this circuit.  I won't go through all of them, but

10   the *Evans* case from 1992 in the Supreme Court makes clear that

11   there has to be a showing of an agreement in exchange for

12   performing specific acts.

13           Similarly, in the more recent case of *McDonnell*, the

14   court held that the jury had to determine that in that case the

15   official agreed to perform a specific act at the time of the

16   alleged *quid pro quo*.

17           There is a similar holding in the Supreme Court's

18   *McCormick* decision from 1991.

19           Then there are several Second Circuit cases which

20   reinforce that, including you the original *Silver* decision from

21   2017, the *Rosen* case from 2013, and *United States v. Ganim* from

22   2007.

23           In this case, the defendants requested an instruction

24   that the government had to prove "that the defendant

25   specifically intended there to be a *quid pro quo*" and they also

1    requested an instruction that, to establish the necessary *quid*

2    *pro quo*, it is not enough for the government to prove that a

3    payment was made for some future act that the employee had

4    already decided to take or for a past act that he has already

5    taken, and the court did decline to give both of those

6    instructions.  And as I mentioned earlier, it also did not

7    instruct the jury that the government had to prove that there

8    was a *quid pro quo* between the two defendants before Mr. Tanner

9    took the acts in question.

10           In addition, the jury instructions stated that all

11   that is required is that Tanner performed or promised to

12   perform the act in question at least in part because of a

13   potential bribe or kickback which was focused exclusively on

14   Mr. Tanner and failed, in our judgment, to communicate to the

15   jury that there had to have been a meeting of the minds between

16   the two defendants, and we did object to that sentence.

17           So at a minimum, again, understanding that the court

18   obviously takes a different view of this, we submit that this

19   is a substantial question, as the Second Circuit apparently

20   recognized in the *Silver* case.

21           In addition, there was a second issue that Mr. Silver

22   raised in his bail application to the circuit which had to do

23   with an instruction that your Honor also gave which permitted

24   the jury to convict on a theory that involved a so-called

25   "stream of benefits" or "as opportunities arise" theory, rather

1    than one that was focused on a particular act in this case by

2    Mr. Tanner, and this issue was not only briefed, but also

3    discussed as well at the oral argument in the *Silver* case, and

4    Judge Cabranes commented during the argument that this was an

5    important question that the circuit had yet to decide as to

6    whether the *McDonnell* case forecloses that theory which

7    previously had been permitted in the Second Circuit.

8            And we think that that statement is supported by

9    *McDonnell* which was focused on the government identifying a

10   particular matter on which a person receiving the bribe has

11   agreed to act and stated that it had to be focused and

12   concrete, among other things.

13           THE COURT:  That's the public service, the public

14   honest services fraud case.

15           MS. SHAPIRO:  That's correct, your Honor.  But I think

16   that the circuit has ruled, including in *DeMizio*, that the case

17   law from the public official cases applies to private sector

18   cases in large part, and also I would just point out --

19           THE COURT:  Certainly not the official act part of it.

20   It can't.

21           MS. SHAPIRO:  Well, there has to be an act.  In this

22   case, it is a corporate act or it is a different kind of act,

23   but it has to be specific.  And I think the court in *McDonnell*

24   reached the conclusion that it did based on three

25   constitutional concerns that it identified which caused the

1    court to construe the honest services fraud statute narrowly in

2    the context of the finding of what in that case the official

3    act, but I would submit the act in a private case, as well; and

4    two of those three concerns clearly apply in private cases.

5    One of them is fair notice, vagueness concerns about both

6    defendants knowing what the line is between criminal conduct

7    and noncriminal conduct in this context, as well as the concern

8    about deterring the government from abusing the broadness, the

9    breadth of the statute.

10           The second constitutional concern which applies

11    equally in private cases and, indeed, perhaps more so, one

12    might add, is the federal concern, because these are obviously

13    things that are governed by state law as well.

14           And at a bare minimum, your Honor, I would submit that

15    the Second Circuit has never addressed the question of to what

16    extent does the *McDonnell* case apply in private honest services

17    fraud cases, and that in and of itself is a novel question of

18    first impression and therefore satisfies the bail standard

19    under the *Randell* case.

20           Just one last point, your Honor.  We also think that

21    there is a substantial question, we respectfully submit that

22    there is a substantial question as to whether the jury

23    instructions were also deficient because they failed to charge

24    that it is not enough for the government to prove that a

25    payment was made to curry favor or build good will.  And, as

1    the court will recall, the defendants requested this specific

2    instruction, and the court declined to give it.  It is directly

3    supported by Second Circuit law, including the *United States v.*

4    *Ganim*, a 2007 case, which I mentioned earlier.

5           And so, in summary, I think the critical point here is

6    that the defendants don't have to show by clear and convincing

7    evidence or otherwise that they are likely to prevail on any of

8    these issues.  The point is, under the Second Circuit

9    precedent, is it a substantial question, is it more than

10   frivolous, is it something courts could disagree on, or is it a

11   novel question.  And I submit at least one of these issues, if

12   not all of them, certainly satisfy that standard.

13          And I would also just note that, given the length of

14   the sentences that have been imposed here today, it is

15   virtually certain that, if bail pending appeal is not granted,

16   defendants will have served most, if not all, of the sentences

17   by the time the appeal is decided, and we ask the court to

18   consider that as well.

19          Thank you.

20          THE COURT:  Thank you.

21          Yes, ma'am.

22          MS. KRAMER:  Your Honor, we must be reading different

23   *Randell* cases, because I understand the Second Circuit to have

24   said that "a substantial question is one that is close or that

25   very well could be decided the other way," and your Honor

1    passed on all of these issues through the various forms of

2    litigation that we have had in this case, from the motion to

3    dismiss through the jury charge, and made decisions that were

4    unequivocal, not that were close or that your Honor viewed

5    could be decided the other way.

6           The Third Circuit in *United States v. Miller*

7    articulated the view expressed by the Congress in enacting

8    Section 3143(b), concerning bail pending appeal, that "once a

9    person has been convicted and sentenced to jail, there is

10   absolutely no reason for the law to favor release pending

11   appeal or even to permit it in the absence of exceptional

12   circumstances."

13          These are all certainly arguments that the defendants

14   will no doubt raise on appeal, but they don't fall into the

15   limited bucket of exceptional circumstances that warrant bail

16   pending appeal.

17          THE COURT:  Thank you.

18          Anything else, Ms. Shapiro.

19          MS. SHAPIRO:  Your Honor, I would just briefly note

20   that the statement about exceptional circumstances is not

21   accurate to the extent the government is suggesting that the

22   substantial issue standard isn't the one that I read from

23   *Randell*, which says, "'Substantial' means one that is not

24   frivolous but, rather, a close question."  The government read

25   that part correctly.  And I would respectfully submit, again,

iau2tanS kjc

1    respecting the court's decisions and its careful attention to

2    the various issues, that -- I understand the court disagrees

3    with defendants' position, but clearly that is not the end of

4    the matter, and that's the whole point.  And, indeed, the

5    *Randell* decision also specifically states that the district

6    court does not need to decide that it erred in order to grant

7    bail pending appeal.

8           And the last thing I will mention is that, in another

9    recent case out of the Eastern District of New York, the *Mark*

10   *Johnson* case, in that case the district court denied bail

11   pending appeal and said there was a presumption against bail,

12   and that was the basis for it.  The Second Circuit took a

13   different view and granted bail in that case, notwithstanding

14   the fact that the defendant was a foreign citizen.

15          And we respectfully submit here, at a minimum, these

16   issues are certainly novel issues the circuit has never

17   considered before, and that is sufficient, under *Randell*, to

18   grant bail.

19          THE COURT:  Anything else?

20          MS. KRAMER:  No, your Honor.

21          THE COURT:  Thank you.

22          I find the defendants have not made out the

23   requirements for bail pending appeal; and, accordingly, it is

24   denied.

25          Is there anything else today, counsel?

1          MR. COOPER:  Yes, your Honor.  Two ministerial issues.

2          One is, I know that the briefing and the argument on

3     restitution are being deferred, but to the extent it is unclear

4     on the record, I believe the court needs to order restitution

5     today and defer determination of losses to that later date, so

6     we would ask that the court do that.

7          THE COURT:  No objection, right?

8          MR. McGUIRE:  No, your Honor.

9          THE COURT:  Restitution is ordered.  The amount will

10    be determined following your briefing, and I assume you will

11    let me know what your schedule is.

12          Thank you.

13          MR. COOPER:  Yes, your Honor.

14          Finally, the government moves to dismiss the

15    underlying indictment in this case as against both defendants.

16          THE COURT:  So ordered.

17          MR. COOPER:  Thank you, your Honor.

18          MS. McCARTHY:  Your Honor, just one minor fact.  We

19    removed from the forfeiture order the trust assets, but I would

20    ask that the government affirmatively lift the restraint on

21    those assets.

22          MR. COOPER:  We will, your Honor.

23          THE COURT:  Yes, sir.

24          Anything else?

25          MR. COOPER:  Not from the government.  Thank you, your

iau2tanS kjc

1   Honor.

2            MS. McCARTHY:  No.

3            MR. McGUIRE:  No, thank you, Judge.

4            THE COURT:  Thank you, counsel.  Thank you again for

5   your presentations, which were exceedingly helpful.

6            Good morning.

7                              oOo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25