**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| JOHN VANDEMOER |

No. 1:19-cr-10079-RWZ

### DEFENDANT JOHN VANDEMOER'S SENTENCING MEMORANDUM

Defendant John Vandemoer respectfully submits this Memorandum to the Court in preparation for his sentencing on June 12, 2019.

### I.     Personal Background

Most importantly, John Vandemoer is the husband of Molly Vandemoer and the father of his three-year-old son, Nicholas and one-year-old daughter, Nora.  Mr. Vandemoer's second love is sailing, and after college he began working for sailing clubs before becoming an assistant collegiate sailing coach, and ultimately, a head coach.  The factual recitations in the Pre-Sentence Report (PSR), which is inevitably built around the worst decision Mr. Vandemoer has ever made, fail to capture his character and values.  As the voluminous letters on Mr. Vandemoer's behalf from family, sailors he coached, colleagues, and friends make clear, John is fundamentally a decent family man who made a terrible mistake and has since worked hard to make amends for his error.

Mr. Vandemoer loves his family dearly.  Throughout this entire process, his primary goal has been to minimize the impact on Molly, Nicholas, and Nora, and determining how he could provide for them after the loss of his job:

- As John's wife Molly explains, "This whole ordeal was a complete shock to both John and I. Once the shock wore off, he was incredibly remorseful for the circumstances he put myself and our kids in, and for what the [Stanford Sailing] team would have to 'weather.' Never once did he feel sorry for himself. Instead, he was angry at the mistake he made and what it was doing to those around him. Soon after March 12th, John moved to problem solving and how to make this right. He found a therapist to help him sort through his emotions, he enrolled in online classes towards an MBA to make himself 'employable' in a new career field, and he is doing everything he can to make all of this transition as easy as possible for our two kids." Letter from Molly Vandemoer, p. 1.[1]

- His sister-in-law notes, "I know John to be a very loving, supportive and devoted husband and father. Family outings are a daily occurrence; and John plays on the floor and reads with his children every day." Letter from Kelly O'Brien, p. 5.

- Parents of a former Stanford sailor offer that "[i]f you want to know John Vandemoer, you need to see him with his son and daughter at the boathouse. One glance tells you all you need to know. He loves those two children and his wife with all his heart. He will do anything he can to make amends for his mistakes so that he can be the kind of father and role model his family deserves." Letter from Michael Borrus and Audi Steele, p. 3.

Mr. Vandemoer has dedicated his professional career to helping smart, talented teenage sailors become successful adults who have the character, integrity, and skills needed to excel in life. It is notable how many sailors, coaches, and parents of his sailors—the people who Mr. Vandemoer's actions have most harmed—have taken the time to share with the Court the impact he has made on their lives. The below is a small sample of how they know Mr. Vandemoer and his character:

- Mr. Vandemoer's former assistant sailing coach, who had to take over head coaching duties following his termination, remarks:

    > Throughout my time working with John his focus has always been on the well being and personal development of our student athletes over results…[John] truly believed that a person should get [to] a have a full college experience regardless of their status as a student athlete. In many other instances, some of which frustrated me because it hurt our results, John allowed our players to miss weeks of practice and competition for a worthwhile internship or series of job interviews. John truly cared that every one of our student athletes left Stanford a better person and productive

---

[1] For ease of reading, all letters are combined into one exhibit and the page numbers in this document refer to the letter's page number in the exhibit.

member of society, an area where many coaches "talk the talk" but do not "walk the walk". John always did what was right for each individual.

Over the years our team experienced many struggles, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ John was the first person ▮▮▮▮ ▮▮▮▮▮▮ to help in any way possible and coordinate support until the parents arrived. John helped each athlete in a caring and compassionate way which allowed them to become the thriving individuals they now are. One of them was even able to overcome their trauma ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, an extremely difficult feat even under perfect circumstances.  Letter from Clinton Hayes, p. 2.

- Samantha Steele, a former Stanford sailor notes that "John cared passionately about his student's long-term success. Often varsity athletes are expected to be athletes first and students only as an afterthought. He recognized that academics matter and cultivated a culture of both academic and athletic excellence. When important classes conflicted with our team practices, John worked with me to ensure I could attend class without losing my standing on the team."  Letter from Samantha Steele, p. 4.

- "Our eldest daughter, Sophia, enrolled at Stanford in the fall of 2017 and, during her time on the team during the past two years, John consistently acted in caring and supportive manner both with her sailing and her transition to life at university away from home. Numerous instances of his attention and consideration included his mindfulness of the challenges she faced in competition with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"  Letter from Carlos and Kendall Sole, p. 12.

- "Many coaches mislead kids into their chances for admission, hoping to retain for themselves as many options as possible. Not John. John was incredibly honest about where Julia stood…I was thrilled Julia said no to other schools to see what happened with John and Stanford. I wanted her to sail for John because I trusted him with my last kid…Nothing in our many interactions with John over the last sixteen years is even remotely similar or suggestive of the conduct to which John promptly confessed; actually, just the opposite." Letter from John Lambert, p. 10.

- "John Vandemoer was our daughter, Samantha Steele's sailing coach at Stanford from 2012-2016. If you want to know John Vandemoer, you need to see him standing all day in a driving rain as his team competed for a National Championship. You need to hear him tell his sailors again, and again, how honesty and integrity were more important than a victory. You need to see him put academics first for every student athlete…If you want to know John Vandemoer, then you have to know that in [an] era of rampant sexual misconduct, his moral directives for the team were clear. Sailing is one of the few coed sports on the Stanford campus. The sailors trained together, traveled together, and competed together. John held all the athletes, regardless of gender, to the highest moral standards… If you want to know John Vandemoer, then you would witness his devotion to the sailing program, his engagement with parents and alumni…It is not surprising to see

the supportive response of so many of us in his current circumstance. We are resolved to be there for John and to help him move forward." Letter from Michael Borrus and Audi Steele, p. 3.

Notwithstanding this mistake, for which he promptly accepted responsibility, Mr. Vandemoer has demonstrated integrity and high moral character throughout his life:

- "For over ten years, John has been and continues to be a guardian of my children, knowing that our son is autistic and non-verbal. John is compassionate, patient, kind, and trustworthy." Letter from Michael O'Bryan, p. 15.

- "It has been said that a man's character can be judged by how they act when no one is looking… one such example of integrity under intense pressure can be found while John was serving as my assistant coach at a conference championship. We were defending national collegiate champions and John noticed that our athlete made a rules error that nobody else spotted. John properly insisted our player withdraw from the race even though that decision could have kept us from defending our national championship. John knew and vocalized the right thing to do - even though nobody else would have ever know! At that awful moment, I was proud to be his boss, colleague, and friend." Letter from Adam Werblow, p. 19.

- "John always acted professionally and with the greatest integrity in all my dealings with him. His overarching desire was to see the youth in this class (and in general) succeed in sailing. His depth of knowledge, his empathy to the youth sailors and his dedication all showed through in every interaction." Letter from John Morgan, p. 30.

- "John always promoted integrity and fair play in all he did during his tenure at Stanford. He is known as a straight shooter; one who adheres to the rules closely…He held himself and his team to a high standard of fair play and sportsmanship…John was also protective of Stanford's assets, making sure that everything that was borrowed (boats/equipment), came back in at least as good shape as it left (if not better). If things were damaged, he put in his own time to make sure repairs were made and the equipment was maintained. John also volunteered countless hours assisting his wife Molly, Director of the PYSF sailing. John's ethic of fair play and sportsmanship is integral to who he is as a person and how he conducts himself." Letter from Katherine Humphreys, p. 17-18.

- A fellow sailing coach who, "over the past three years…saw John on a daily basis coaching the Stanford sailing team," notes that "John cares deeply about the young people he coached throughout his career. While many coaches focus solely on technical skills and athletic performance, John focuses on developing life skills and emphasizing personal development in addition to their sports careers, which benefits young people in the long run beyond their sailing aspirations and careers…[I] found his work ethic and professionalism outstanding and rare to find." Letter from Udi Gal, p. 33.

Mr. Vandemoer is before this Court because in one instance he failed to live up to the high standards he set for himself and instilled in countless young people. This is a mistake he regrets dearly and one that he is determined not to let define him or his life.

**II.    A sentence of probation is "sufficient, but not greater than necessary" to meet the statutory goals outlined in 18 U.S.C. § 3553(a).**

Mr. Vandemoer knows that he need not remind this Court of the seriousness of sentencing or engage in an extensive overview of the statutory underpinnings of a federal sentence. 18 U.S.C. § 3553(a) requires courts to impose the minimum sentence necessary to achieve broad goals set out therein. It in turn lays out factors that courts must consider when crafting said sentencing. Here, those factors—the circumstances of the offense, the applicable sentencing guidelines, deterrence, and the need to avoid unwanted sentencing disparities—ultimately support a sentence of probation.

**a.  Circumstances of the offense**

Mr. Vandemoer takes responsibility for his actions. He loved working for Stanford and deeply regrets that his actions have caused difficulties for both his student-athletes and an institution he respects. It is with that backdrop that Mr. Vandemoer respectfully submits to the Court that certain aspects of his conduct and this scheme are mitigating factors for this Court to weigh as it crafts his sentence.

Although the Government can and has charged many of the individuals who participated in this scheme, including Mr. Vandemoer, with racketeering conspiracy, this is fundamentally a case of fraud, which is reflected in the fact that four of the five racketeering acts in Mr. Vandemoer's Information are acts of fraud. As it relates to Mr. Vandemoer, this fraud contains two critical facts that are unlike the vast majority of frauds seen by this or any court.

1. <u>Mr. Vandemoer did not personally profit from the scheme even though he easily could have done so.</u>

It cannot be overstated: *all parties agree that Mr. Vandemoer did not personally profit from the scheme*. This was not because he tried to profit and failed or because he got caught before he could profit. Mr. Singer sent Mr. Vandemoer money, and he consistently turned that money over to Stanford. Nor was it because Mr. Vandemoer lacked either the opportunity or the need to profit from the scheme. As the related indictments and informations of nearly a dozen coaches show, all Mr. Vandemoer had to do was tell Mr. Singer to pay the money directly to him and Mr. Singer plainly would have done so. As the PSR shows, Mr. Vandemoer, like most Americans, has debt that these funds could have addressed. Nevertheless, on multiple occasions, Mr. Vandemoer told Mr. Singer that the funds should be made out to Stanford University for the sailing program and not to Mr. Vandemoer personally.

The final check Mr. Vandemoer received from Mr. Singer is instructive on this point. That check arrived October 2018 when Mr. Singer was already working with the FBI. Unlike the other checks that were sent before Mr. Singer started working with the FBI, this check was not made out to Stanford "care of" Mr. Vandemoer, rather it was made out to Stanford Sailing and John Vandemoer. *Compare* PSR at 34 (first check made out to "Stanford, <u>care of</u> Vandemoer" (emphasis added)); *id.* at 40 (second check made out to "Stanford Athletics Department, <u>care of</u> Vandemoer" (emphasis added)); *with id.* at 51 (FBI assisted, final check made out to "Stanford Sailing John Vandemoer."). It is not difficult to see this as an offer from law enforcement for Mr. Vandemoer to personally pocket the money, and yet, he nevertheless turned it over to the University just as he had done with the two prior checks.

It is important that this Court understand these two University accounts and the protocols in place for them.[2] These accounts were for uniforms, equipment, and to pay the salary of an assistant coach. They did not pay for meals, lodging, or reimbursements for petty charges. Mr. Vandemoer did not have a credit or debit card for these accounts. Mr. Vandemoer could not disburse from these accounts without significant oversight. If Mr. Vandemoer wanted to purchase new uniforms with these funds, then he had to seek and receive approval to spend this money from six different approvers, ranging from an associate athletic director to the accounting office. There is no allegation that these funds were spent in any improper way. Mr. Vandemoer's intent, while misguided, was to help the sailing program he loved.

> 2. <u>Stanford did not lose any money under this scheme and no one was admitted to Stanford because of this scheme.</u>

As the Government has laid out in indictments, informations, and press conferences, the universities are the victims of Mr. Singer's schemes. Here, Stanford, as the victim, lost no money. Stanford actually received money it would have otherwise not received because of the scheme. (This, of course, is not to suggest Mr. Vandemoer believes Stanford is better off because of his actions.)

Further, not a single student was accepted (let alone enrolled) into Stanford because of Mr. Vandemoer. Regarding the two students at issue here, the first, ultimately decided to attend another institution and the second opted not to pursue attending Stanford. Both events happened before admission (and before Mr. Vandemoer made any material misrepresentations to Stanford).[3]

---

[2] The funds went into two different accounts. One account was for uniforms and equipment and the other is for the salary of an assistant coach. The protocols for the accounts were the same.

[3] The Government noted at the plea hearing that one individual related to Singer was admitted to Stanford with fabricated sailing credentials, leading to much confusion in the press and with the public. It cannot be stressed enough, Mr. Vandemoer had nothing to do with this student's admission. The Government acknowledged this during the hearing. Transcript of Rule 11 Hearing, p.16:13-15 ("Defendant did not help this applicant -- this

### b. The Applicable Sentencing Guidelines

Mr. Vandemoer and the Government originally agreed that the total offense level was 20. The Government now believes the level is 21, and Probation has determined the correct offense level is 18.[4] Under the guidelines as calculated by Probation, Mr. Vandemoer's offense level is significantly higher because his underlying conduct was part of a racketeering enterprise.

As this Court is well aware, for racketeering conspiracy, the United States Sentencing Guidelines Statutory Index refers to Section 2E1.1, which then directs the calculator to determine the offense level by applying the greater of 19 or the offense level for the underlying predicates; here, substantive and honest services mail and wire fraud, under 18 U.S.C. § 1341 and § 1343, and money laundering under 18 U.S.C. § 1956. Probation has calculated the underlying offense level for each of these predicates at 7.[5] An offense level of 7, with Mr. Vandemoer's non-existent criminal history, leads to a sentencing range of 0 to 6 months. However, because this underlying conduct is part of a larger racketeering enterprise, Probation's ultimate offense level is 11 levels higher (18) and the guidelines skyrocket to 27 to 33 months.

This is not altogether bizarre. Indeed, the original purpose of RICO was to allow prosecutors to levy higher sentences against lessor members of organized crime enterprises in

---

candidate's application in any material way."). Mr. Vandemoer wants to be clear: he did not assist with the creation of these alleged fraudulent credentials and he did not assist this student's admission into Stanford in any way.

[4] The Government and Mr. Vandemoer agreed in the plea agreement that USSG Section 2B1.1 was the proper guideline and that the loss amount was between $550,000 and $1,500,000. After adding enhancements and reductions "the parties agree[d]…that Defendant's total 'offense level' under United States Sentencing Guidelines is 20." Plea Agreement at 1. Probation agreed that Section 2B1.1 was the proper guideline, however it determined there is no loss amount. The Government objected to the loss amount determination and, notwithstanding the Plea Agreement, to Probation calculating Mr. Vandemoer's guideline range under Section 2B1.1—instead of Section 2B4.1, "Bribery in Procurement of Bank Loan and Other Commercial Bribery"—claiming that its original assessment that Section 2B1.1 was the proper section was in error. This would add a point to the original calculation and raise the low-end of Mr. Vandemoer's guidelines four months and the high-end five months. Probation rejected this argument and applied Section 2B1.1. Mr. Vandemoer continues to believe Section 2B1.1 is the correct guideline.

[5] A two-point enhancement for position of trust and a two-point decrease for acceptance of responsibility applies, which leaves the offense level at 7.

order to encourage cooperation against more significant members. *See, e.g.*, Westlaw Practical Guide, White Collar Crime: RICO § 1:2, A brief history of RICO. But here, because of the significant mitigating factors outlined above, the fact that there is no evidence Mr. Vandemoer knew or cared about the larger enterprise, and the prompt acceptance of responsibility by Mr. Vandemoer, he respectfully submits the drastically higher racketeering enterprise guideline does not properly reflect the true culpability of his conduct.

### c. Specific and General Deterrence

§ 3553(a)(2) instructs courts to consider what sentence is necessary "to afford adequate deterrence to criminal conduct." Mr. Vandemoer respectfully submits that a sentence of probation will meet the sentencing goals of specific and general deterrence.

#### 1. Specific Deterrence

There is simply no way incarceration is necessary to deter Mr. Vandemoer from ever doing this, or anything like this, again. As an initial matter, Mr. Vandemoer is a first time offender and "[t]here is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I. Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (internal citations omitted). Even if Mr. Vandemoer were a typical defendant, he would be very unlikely to re-offend.

Of course, Mr. Vandemoer is not a typical defendant. Mr. Vandemoer had his dream life. He had a nice house, a great family, and got to spend all day on the water, coaching bright, young people in the sport he loved. He has, of course, been fired.[6] It is difficult to believe that any

---

[6] The Court can and should consider collateral consequences to Mr. Vandemoer. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (when considering deterrence, sentencing court properly considered conviction's impact on defendant's career as "it is difficult to see how a court can properly calibrate a "just punishment" if it does not consider the collateral effects of a particular sentence").

9

university will ever hire him again. His conduct has been extensively reported both nationally and internationally. For the last three months, he has been publicly reminded about this mistake every day and he will continue to have to live with the knowledge that everyone—from loved ones to acquaintances—knows about the worst mistake of his life. Once fired, he was evicted from his university housing. His kids may have to leave their daycare.

      2.   <u>General Deterrence</u>

Incarceration is also unnecessary to serve as a general deterrence in this case. This case could not have more publicity. It is hard to imagine there is a college coach in the country who does not know what Mr. Vandemoer did and understands the consequences of those actions. Every single collegiate coach in the country is now on notice that, if you do this, then you will be fired, your collegiate career is over, and you will likely become a felon. Assuming this scheme is even still possible going forward,[7] no rational coach would decide to do it, regardless of whether Mr. Vandemoer is incarcerated.

    d.  **The Need to Avoid Unwanted Sentencing Disparities**

§ 3553(a)(6) instructs the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* Over 50 individuals have been charged in this matter and Mr. Vandemoer is the first individual to be sentenced. He is also perhaps the least culpable. As noted above, the Government acknowledges that Mr. Vandemoer was the only coach who did not personally profit from the scheme. The parents who participated in this scheme also all gained a benefit: they secured admittance (or, in the case of the ACT scheme, at least materially increased, their child's chances

---

[7] Multiple universities, including Stanford, have publicly stated they are changing their policies and procedures to prevent such a scheme from happening in the future.

of being admitted) to a prestigious university. In contrast, Mr. Vandemoer secured funds for the sole benefit of the program and its student-athletes.

Several parents have agreed to plead guilty. For instance, Peter Jan Sartorio has pled guilty to one count of conspiracy to commit mail fraud and honest services mail fraud. He paid $15,000 in cash for Mr. Singer to secure a fraudulently high ACT score for his daughter. His offense level is 7, his guideline range is 0-6 months, and the U.S. Attorney has agreed to seek something "within the guideline range." Plea Agreement of Jan Sartorio at 2.[8] Two other parents have guideline ranges of 4-10 months and the prosecution has agreed to recommend a sentence "at the low end" of these guidelines.[9] Felicity Huffman Plea Agreement at 2; Marjorie Klapper Plea Agreement at 2.

Coach Michael Center pled guilty to conspiracy to commit mail fraud and honest services mail fraud. While the mechanics of the interactions between him and Mr. Singer are largely similar to Mr. Vandemoer's interactions with Mr. Singer, Mr. Center differs from Mr. Vandemoer's in two important ways. First, Mr. Center personally pocketed much, if not all, of approximately $100,000 he received, whereas, Mr. Vandemoer did not pocket a dime. *See* Affidavit in Support of Criminal Complaint Against Michael Center at 3. Second, Mr. Center signed his fraudulent athletes to a "books" scholarship, which meant his university could have paid out unearned scholarship money to the (non)-athlete for textbooks.[10] *Id.* at 4-6. Not one of the students that Mr. Vandemoer assisted went to Stanford and, even if they had, their affiliation with Stanford Sailing

---

[8] The Government has conveniently posted all plea agreements, complaints, informations, and indictments at https://www.justice.gov/usao-ma/investigations-college-admissions-and-testing-bribery-scheme.

[9] The parents were not charged with a racketeering conspiracy, which, as noted above, greatly increases Mr. Vandemoer's guideline range.

[10] The complaint against Mr. Center states that the athlete withdrew from the team and books scholarship in question, but it does not state whether any of the scholarship was paid before said withdrawal.

would not have made them eligible for any scholarship money from the University. Mr. Center has an offense level of 14, his guideline range is 15-21 months, and the U.S. Attorney has agreed to seek something "at the low end" of the guideline range. Michael Center Plea Agreement at 2. Mr. Vandemoer respectfully submits that a sentence of probation would be consistent with his culpability relative to the culpability of other defendants.

In light of the unique nature of the conduct here, specifically that Mr. Vandemoer never personally profited from the scheme (and never intended to), that he gave the money to the victim, and that the University lost no money, a sentence of probation would be consistent with prior fraud sentencings in this district:

| Case Name | Defendant Name | Convicted Conduct | Guideline Range (in Months) | Amount Victim Lost (or would have lost if successful) | Amount Defendant Gained (or would have gained had the scheme been successful) | Months of Incarceration |
|---|---|---|---|---|---|---|
| U.S. v. Godfrey et al - Vernell Burris Jr. 1:11-cr-10279 | Vernell Burris Jr. | 18 U.S.C. § 371 - conspiracy; 18 U.S.C. § 1343 - wire fraud | 135-168 | $3,588,523 | $4,135,130 | 12 |
| U.S. v. Armstrong 1:14-cr-10376 | Roger A. Armstrong | 26 U.S.C. § 7206(1) - Filing False Tax Returns | 18-24 | Approximately $200,000 | Approximately $200,000 | 0 |
| U.S. v. Gerbutavich 1:14-cr-10291 | Charles Gerbutavich | 18 U.S.C. § 641 - Theft of Public Money | 12-18 | $161,587 | $161,587 | 0 |
| U.S. v. Desper 1:17-cr-10217 | Todd Andrew Desper | 18 U.S.C. § 1343- Wire Fraud; 18 U.S.C. § 1349- Attempted wire fraud | 63-78 | $105,000,000 | $105,000,000 | 0 |
| U.S. v. Vandemoer 1:19-cr-10079 | John Vandemoer | 18 U.S.C. § 1956 | 27-33 (as calculated by Probation) | $0 | $0 | |

### III.   Conclusion

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007).  This case presents precisely such significant mitigating factors and they weigh in favor of a sentence of probation.  Such a sentence would be sufficient, but not greater than necessary, to meet the goals of § 3553(a).

Mr. Vandemoer failed in one instance to live up to the high expectations he sets for himself. He fully accepts responsibility for his mistake.  Mr. Vandemoer is determined to make amends for this mistake, move on with his life, and continue to provide for his family.  As John's wife Molly shared in her letter to this Court:

> I was asked shortly after all of this went public about how mad I must be towards John. The question really surprised me, as anger never entered my mind. I know he made a mistake. I know it is extremely costly to his livelihood, to our family, etc. But I know he will never do something like this again. I know he will continue to be an upstanding member of society, and I know he will always be the loving, patient, and hard working man I met 13 years ago. I ask that you consider his character outside of this ordeal, and the impact his absence would have on our two young kids when determining his sentence.

Letter from Molly Vandemoer, p. 1.

For the foregoing reasons, Mr. Vandemoer respectfully submits that a sentence of probation is appropriate in this matter.

                                                Respectfully submitted,

                                                JOHN VANDEMOER

                                                By his attorneys,

                                                */s/ Robert A. Fisher*  
                                                Robert A. Fisher (BBO No. 652602)  
                                                R. Scott Seitz (BBO No. 696658)  
                                                NIXON PEABODY LLP  
                                                53 State Street  
                                                Boston, MA 02109  
                                                617-345-1000  
                                                rfisher@nixonpeabody.com  
                                                sseitz@nixonpeabody.com

Dated: June 7, 2019

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the forgoing was filed electronically on June 7, 2019, and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

                                                */s/ Robert A. Fisher*  
                                                Robert A. Fisher